# IN THE SUPREME COURT OF IOWA

No. 11–0927

Filed December 14, 2012

**STATE OF IOWA,**

    Appellee,

vs.

**ALLEN BRADLEY CLAY,**

    Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Plymouth County, Jeffrey L. Poulson, Judge.

A defendant seeks further review of the court of appeals decision affirming his conviction for second-degree burglary. **COURT OF APPEALS DECISION VACATED IN PART AND AFFIRMED IN PART; DISTRICT COURT AFFIRMED.**

Mark C. Smith, State Appellate Defender, and David Arthur Adams, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Elisabeth S. Reynoldson, Assistant Attorney General, and Darin J. Raymond, County Attorney, for appellee.

**WIGGINS, Justice.**

A jury found the defendant guilty of second-degree burglary, operating a motor vehicle without the owner's consent, and operating a motor vehicle while intoxicated, second offense. The defendant only appealed his burglary conviction. We transferred the case to the court of appeals. It affirmed the conviction. The defendant now seeks further review from the court of appeals decision. On appeal, the defendant contends there was insufficient evidence to support his conviction for second-degree burglary. The defendant also argues his trial counsel was ineffective for not objecting to (1) the prosecutor's misstatements in his rebuttal closing argument regarding the intent-to-deprive element of theft, (2) four colloquies of hearsay testimony elicited by the prosecutor, and (3) the prosecutor's statements in his rebuttal closing argument concerning nontestifying witnesses.

Upon our review, we affirm the court of appeals decision regarding the sufficiency of the evidence to support the second-degree burglary conviction and let it stand as our final decision. However, we vacate the court of appeals decision with respect to the effectiveness of counsel claims. We leave all three ineffective-assistance-of-counsel claims for postconviction relief proceedings. Finally, we affirm the defendant's convictions for operating a motor vehicle without the owner's consent and operating a motor vehicle while intoxicated, second offense.

**I. Background Facts and Proceedings.**

Allen Bradley Clay spent the afternoon of July 24, 2010, helping his friend, Lucky Overman, change the tires on one of his vehicles. While Overman was taking Clay home, Clay asked Overman to buy him alcohol. Overman refused to do so. Clay did not react.

After taking Clay home, Overman made his regular run as a truck driver for Blue Bunny. He got home around three o'clock in the morning on July 25. He parked his Blazer SUV alongside his mobile home in Le Mars. He entered the home from the front porch and put his paperwork and keys on the kitchen counter. Overman checked on his sleeping family and then went to bed.

At approximately 4:30 a.m., Overman heard noises coming from the kitchen. He assumed the source of the noise was his large cat lurking around at night. The noises continued for a few minutes.

Then Overman saw his Blazer's headlights come on. Overman jumped out of bed and saw someone backing his Blazer out of the drive pretty fast, as if in a hurry. He could see one person in the vehicle. However, he was unable to distinguish the gender, height, or age of the individual.

Overman called 911, because he believed someone had stolen his Blazer. He had no clue which direction the Blazer went.

Shortly thereafter, Overman received a text message from Kayla VanEs, Clay's girlfriend. She allegedly texted that Clay was "three sheets to the wind and he's pretty much got your Blazer and he's heading more than likely out to his mother's house . . . ." Overman called 911 a second time to report this information.

Overman then began to investigate his property and noticed several objects were out of place. He saw a trash can had been moved by the window just outside the mobile home. He also observed that someone had removed a window screen from the home.

Lieutenant Treloar from the Le Mars Police Department arrived at Overman's home around 5:15 a.m. Overman showed Treloar the misplaced window screen and trash can. While walking outside with

Treloar, Overman saw a bicycle lying in the yard, just a few feet from the trailer. Upon looking closer at the bicycle, Overman realized it was Clay's.

Clay always rides a bicycle for transportation because he does not have a driver's license. Overman had seen Clay ride that particular bicycle many times. Overman stated the bicycle was not there when he came home from work.

After this discovery, Treloar called VanEs by phone to ask her where Clay might be. He testified, "She indicated to me at that time that [Clay] had been drinking all day and that possibly he was en route to his mother's residence in Hudson, South Dakota." Treloar then had a state broadcast sent out with a description of the vehicle, Clay as a possible suspect, and Hudson, South Dakota, as Clay's possible destination.

As Overman and Treloar continued to investigate, Overman realized his keys to the Blazer and storage shed were missing from the kitchen counter. Treloar also noticed there was a putty knife stuck in the wall beside the mobile home's door handle. Treloar took the putty knife, slid it between the door and the door jam, and depressed the door plunger. By doing so, Treloar was able to open the home's door. Treloar concluded that was how the perpetrator entered the residence. Overman reported that he normally kept the putty knife in his storage shed. The latch on the shed's screen door had been broken, and the door had been pried open.

After conducting this initial investigation, Treloar left. Ten to thirty minutes later, Overman received a phone call from Ashley Clay (aka Ashley Arens), Clay's sister. Overman testified, "She stated that she was going to be driving [Clay] back with my Blazer." Overman called 911 again to inform them of this phone call.

Within an hour of her phone call, Ashley arrived at Overman's mobile home with her brother in the Blazer. Ashley was driving. Clay said nothing. Ashley allegedly told Overman that "she had observed Allen going down the lane at her place, . . . got him stopped, and was bringing [Overman's] Blazer back." Overman never gave Clay permission to drive his Blazer.

Police arrested Clay after he attempted to escape through the back door of the mobile home. When handcuffing Clay, Treloar observed the strong odor of alcohol on his breath and person. Clay's eyes were dilated and bloodshot, his speech was slurred, and his balance was unsteady.

Treloar spoke with Clay's sister after placing him in the patrol car. Shortly after this conversation, police escorted Clay to the Plymouth County jail.

Clay pled not guilty to the charges. The jury found Clay guilty of all three charges. Clay appealed. He raised a sufficiency-of-the-evidence argument regarding his burglary conviction and three ineffective-assistance-of-counsel claims. He did not appeal his convictions for operating a motor vehicle without the owner's consent and operating a motor vehicle while intoxicated, second offense. We transferred the appeal to the court of appeals. The court of appeals affirmed his burglary conviction and resolved one of his ineffective-assistance-of-counsel claims. The court of appeals left the other two claims of ineffective assistance of counsel for a postconviction relief action. Clay filed his application for further review, which we granted.

**II. Issues.**

In this appeal, Clay raises numerous issues regarding his burglary conviction. First, he makes a sufficiency-of-the-evidence argument. He also raises three ineffective-assistance-of-counsel claims. In his first

claim, he argues his counsel was ineffective for failing to object to the prosecutor's rebuttal closing argument, when the prosecutor improperly instructed the jury on the law. Next, he alleges his trial counsel was ineffective for failing to object to four out-of-court statements admitted into evidence. Finally, he claims his counsel was ineffective for failing to object to the prosecutor's rebuttal closing argument, when the prosecutor commented on nontestifying witnesses.

On further review, we have the discretion to review all or some of the issues raised on appeal or in the application for further review. *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 483 (2012). In exercising our discretion, we choose only to review the ineffective-assistance-of-counsel claims. Therefore, we let the court of appeals' affirmance on the sufficiency of the evidence regarding the burglary conviction stand as the final decision of this court. *See Hills Bank & Trust Co. v. Converse*, 772 N.W.2d 764, 770 (Iowa 2009).

### III. Standard of Review.

We review claims of ineffective assistance of counsel de novo. *State v. Brubaker*, 805 N.W.2d 164, 171 (Iowa 2011). This is our standard because such claims have their "basis in the Sixth Amendment to the United States Constitution." *State v. Canal*, 773 N.W.2d 528, 530 (Iowa 2009). We ordinarily preserve such claims for postconviction relief proceedings. *State v. Wills*, 696 N.W.2d 20, 22 (Iowa 2005). "That is particularly true where the challenged actions of counsel implicate trial tactics or strategy which might be explained in a record fully developed to address those issues." *State v. Rubino*, 602 N.W.2d 558, 563 (Iowa 1999). We will resolve the claims on direct appeal only when the record is adequate. *Id.*

### IV. Ineffective Assistance of Counsel.

Ineffective assistance of counsel constitutes " 'deficient performance by counsel resulting in prejudice, with performance being measured against an "objective standard of reasonableness," "under prevailing professional norms." ' " *State v. Maxwell*, 743 N.W.2d 185, 195 (Iowa 2008) (quoting *Rompilla v. Beard*, 545 U.S. 374, 380, 125 S. Ct. 2456, 2462, 162 L. Ed. 2d 360, 371 (2005) (citations omitted)). "[N]ot every claim of ineffective assistance, even a meritorious one, requires reversal of a criminal conviction." *Simmons v. State Pub. Defender*, 791 N.W.2d 69, 75 (Iowa 2010) (emphasis omitted). To prevail on a claim of ineffective assistance of counsel, a claimant must satisfy the *Strickland* test by showing "(1) counsel failed to perform an essential duty; and (2) prejudice resulted." *Maxwell*, 743 N.W.2d at 195 (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674, 693 (1984)). " 'Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.' " *Id.* (quoting *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693).

### A. Counsel's Failure to Perform an Essential Duty, Generally.

Under the first prong of *Strickland*, "we measure counsel's performance against the standard of a reasonably competent practitioner." *Id.* at 195–96. There is a presumption the attorney performed his duties competently. *Id.* at 196. The claimant successfully rebuts this presumption by showing a preponderance of the evidence demonstrates counsel failed to perform an essential duty. *Id.* A breach of an essential duty occurs when counsel makes such serious errors that he or she " 'was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' " *State v. Palmer*, 791 N.W.2d 840, 850 (Iowa 2010)

(quoting *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693). We do not find such a breach by second-guessing or making hindsight evaluations. *Maxwell*, 743 N.W.2d at 196.

In deciding whether counsel failed to perform an essential duty, we measure trial counsel's performance "objectively by determining whether [it] was reasonable, under prevailing professional norms, considering all the circumstances." *State v. Lyman*, 776 N.W.2d 865, 878 (Iowa 2010). The Supreme Court recognizes the American Bar Association standards and similar documents reflect the prevailing norms of the legal profession. *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694.

Regarding an essential duty, the ABA Standards for Criminal Justice require:

> (e) Defense counsel, in common with all members of the bar, is subject to standards of conduct stated in statutes, rules, decisions of courts, and codes, canons, or other standards of professional conduct. Defense counsel has no duty to execute any directive of the accused which does not comport with law or such standards. Defense counsel is the professional representative of the accused, not the accused's alter ego.

ABA Standards for Criminal Justice: Prosecution Function and Defense Function 4-1.2(e), at 120–21 (3d ed. 1993). Moreover, the comments to the ABA standards provide:

> Advocacy is not for the timid, the meek, or the retiring. Our system of justice is inherently contentious, albeit bounded by the rules of professional ethics and decorum, and it demands that the lawyer be inclined toward vigorous advocacy. Nor can a lawyer be half-hearted in the application of his or her energies to a case. Once a case has been undertaken, a lawyer is obliged not to omit any essential lawful and ethical step in the defense, without regard to compensation or the nature of the appointment. . . .

> Because the law is a learned profession, lawyers must take pains to guarantee that their training is adequate and their knowledge up-to-date in order to fulfill their duty as advocates.

*Id.* cmt., at 122–23 (footnote omitted).  We also rely on our ethical rules for lawyers to measure counsel's performance.  *State v. Schoelerman*, 315 N.W.2d 67, 71–72 (Iowa 1982).

At the time of trial, our ethical rules stated, "A lawyer shall provide competent representation to a client.  Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation."  Iowa R. of Prof'l Conduct 32:1.1.  Competent representation requires counsel to be familiar with the current state of the law.  *State v. Hopkins*, 576 N.W.2d 374, 379–80 (Iowa 1998).

**B.  Prejudice from Counsel's Failure to Perform an Essential Duty, Generally.**  The second prong of *Strickland* requires prejudice to result from counsel's failure to perform an essential duty.  *Maxwell*, 743 N.W.2d at 195 (citing *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693).  "Prejudice exists where the claimant proves by 'a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Maxwell*, 743 N.W.2d at 196 (quoting *Bowman v. State*, 710 N.W.2d 200, 203 (Iowa 2006)).  Specifically, we recognize:

> [T]he prejudice prong of the *Strickland* test does not mean a defendant must establish that counsel's deficient conduct more likely than not altered the outcome in the case.  A defendant need only show that the probability of a different result is sufficient to undermine confidence in the outcome.

*Id.* at 196 (citation and internal quotation marks omitted).

The plaintiff in a postconviction relief action must prove prejudice by a preponderance of the evidence.  *Id.*  "In determining whether this

standard has been met, we must consider the totality of the evidence, what factual findings would have been affected by counsel's errors, and whether the effect was pervasive or isolated and trivial." *State v. Graves*, 668 N.W.2d 860, 882–83 (Iowa 2003) (citing *Strickland*, 466 U.S. at 695–96, 104 S. Ct. at 2069, 80 L. Ed. 2d at 698–99). Counsel's unprofessional errors resulting in the mere impairment of presenting the defense is not sufficiently prejudicial. *Ledezma v. State*, 626 N.W.2d 134, 143 (Iowa 2001) (citing *Strickland*, 466 U.S. at 693, 104 S. Ct. at 2067–68, 80 L. Ed. 2d at 697).

**C.  Analysis.** We first address Clay's argument that his trial counsel was ineffective for failing to object during the State's rebuttal closing argument when the prosecutor commented on the intent-to-deprive element of theft. The court instructed the jury on the elements of burglary as follows:

1. That on or about the 25th day of July, 2010, the defendant entered or broke into a residence of Lucky Overman at 23 Orchard, Armel Acres, Le Mars, Plymouth County, Iowa.

2. The residence was an occupied structure as defined in Instruction No. 17.

3. The defendant did not have permission or authority to enter the residence.

4. One or more persons were present at the time the defendant entered the residence.

5. The residence was not open to the public.

6. The defendant did so with the specific intent to commit a *theft*.

(Emphasis added.)

The court instructed the jury on the elements of theft as follows:

1. An individual takes possession or control of property belonging to another.

2. An individual has the intent to deprive the owner of the property.

3. The property, at the time of the taking, belonged to or was in the possession of the owner.

The court did not elaborate on the intent-to-deprive element of theft. In his rebuttal closing argument, the prosecutor argued:

> As to the discussion about the theft element, the intent to deprive is an element of every theft and implicitly part of the burden. There's no hiding the ball here, Folks. But there's a difference. Mrs. Gries' argument would absolutely be true and I would agree with her if the element of the offense said to *permanently deprive*, meaning, "I took it. I pawned it. You ain't never getting it back." That's permanent deprivation of property. "I buried it. I burned it. I sold it. I hid it from you so you would never get it back." *That's permanently depriving. That is not the definition in this instruction. It's not the definition of the burglary instruction. Just an intent to deprive. And that can be temporary that he took it.* It was outside of Mr. Overman's control and knowledge and that is a temporary deprivation of the use of that property. Very technical. Sounds like a damn lawyer argument. But I'm sorry. That's what it is. If Mr. Overman woke up with a sick child and needed to go to the hospital and he needed to use that vehicle in the two to three hours it was missing, he was deprived of the use of that vehicle for that two to three hours until he got it back. That's the type of deprivation. *Again, if the instruction and other areas of the law did require me to prove a permanent deprivation, then Ms. Gries' argument would be true.* In this case it fails. Borrowing a vehicle is enough. *Borrowing it without somebody's permission, knowledge, express consent is a temporary deprivation to the owner of the use of that property.*

(Emphasis added.)

Our well-settled law clearly establishes the intent required for committing theft of an automobile is the *"intent to permanently deprive the owner"* of the property. *State v. Schminkey*, 597 N.W.2d 785, 789 (Iowa 1999) (emphasis added). We reaffirmed *Schminkey* in *State v. Morris*, 677 N.W.2d 787, 788 (Iowa 2004).

Here, the jury instruction for burglary only indicates the defendant had to act with the "specific intent to commit a theft." The theft

instruction used in Clay's trial describes the intent-to-deprive element as follows: "An individual has the intent to deprive the owner of the property." Thus, the jury's only source of information as to whether theft, an element of burglary, requires temporary or permanent intent to deprive was the prosecutor's statement in his rebuttal closing argument.

Therefore, the prosecutor's statement as to the law was clearly erroneous and outside the jury instructions. A prosecutor can argue the law, but cannot instruct the jury on the law. *State v. Mayes*, 286 N.W.2d 387, 392 (Iowa 1979). When the prosecutor erroneously instructed the jury on the law, competent counsel should have been aware of the well-settled legal principles establishing it is the province of the court to instruct the jury on the law. Moreover, the prosecutor's instruction that theft can be committed without the intent to permanently deprive the owner of the vehicle was erroneous. At that point, competent counsel should have lodged an objection to the prosecutor's statements. We find no strategic reason for trial counsel not to object. Therefore, we conclude trial counsel was ineffective for failing to object to the prosecutor's statement on the law in the rebuttal closing argument.

As to the prejudice prong regarding this claim, the only evidence in the record regarding Clay's intent to permanently deprive Overman of his vehicle are out-of-court statements made by third parties introduced into evidence without objection. These statements entered the record through the testimony of Overman and Treloar. Overman testified as follows concerning a text message he received from Clay's girlfriend, VanEs:

> Q. All right. Now, how did you learn that, that Allen Clay had your Blazer and he may be headed to Alcester, South Dakota, or Hudson, South Dakota? A. From the phone call I had gotten from Kayla VanEs.

Q. To be clear, was it a phone call or text or message or some other communication? A. I believe it was a text message.

Q. All right. Who was Kayla VanEs? A. Allen Clay's girl friend or fiancé. Not real sure which.

Q. But you know Kayla? A. Yes, yes.

Q. And how long have you known Miss VanEs? A. Four or five years, give or take. Not as long as I've known Allen.

Q. And what did you learn from Miss VanEs in this communication? A. That he was three sheets to the wind and he's pretty much got your Blazer and he's heading more than likely out to his mother's house is what she told me.

Overman also relayed a phone call he received from Clay's sister, Ashley:

Q. Okay. About how long after law enforcement left did you get a call? A. Oh, I would say ten, ten minutes, twenty, thirty minutes, right in that area.

Q. And what did you learn from Ms. Clay—or Ms. Arens? A. That Allen was out there and she was driving him back.

. . . .

Q. All right. So law enforcement leaves and you said about ten or ten or fifteen minutes you get a call from Ashley. You learn that Allen is out there. Did you learn anything else? A. Not at the time. She stated that she was going to be driving him back with my Blazer.

Q. So they've got your Blazer and they're bringing it back? A. Yes.

. . . .

Q. Does Ashley come in the house? A. Yes.

Q. Do you talk to her? A. Yes.

Q. Does she explain the circumstances? A. Just that she had observed Allen going down the lane at her place and got him stopped and was bringing my Blazer back.

Q. Anything else—go ahead. A. She was just as shocked as I was over the whole thing.

The third piece of evidence regarding Clay's intent came in during the State's questioning of Treloar:

> Q. We will get back to how you learned that Mr. Clay took the vehicle in a minute. Let's go back to when you arrived at the trailer and met with Mr. Overman. He described his vehicle being taken. What happened next? A. At that time he indicated that he had received a text message from Kayla VanEs. She informed him that her boyfriend, Allen Clay, was intoxicated and possibly en route to his residence.
>
> Q. So did that give you some valuable information about what you needed to do? A. Yes, it did.
>
> Q. And what did you do? Did you ask other officers to try to round this vehicle up? A. While I was there, we observed that bicycle in the yard and Mr. Overman indicated that that bike belonged to Mr. Clay. I then contacted Kayla VanEs by phone, asked her if she had any idea where Mr. Clay may be. She indicated to me at that time that he had been drinking all day and that possibly he was en route to his mother's residence in Hudson, South Dakota.

The fourth line of evidence regarding Clay's intent came from Treloar's testimony regarding his contact with Clay's sister:

> Q. You get a second [911] call then? A. Yes, I do.
>
> Q. What happens? A. Sometime a little after 6, 6:30, Plymouth County Communications had received another phone call from Mr. Overman on the 911. He indicated that he had been contacted by Ashley Arens, who is Mr. Clay's sister. She lives rural route Akron, Iowa. She indicated that she had his vehicle and that her brother, Allen, was with her and they were en route back to Le Mars to bring his vehicle back.
>
> . . . .
>
> Q. After taking him into custody, anything else happen in the home? A. After I placed him in the patrol car, I had an opportunity to speak with his sister.
>
> Q. And why did you do that? A. Because I wanted to know what information she could offer me in regards to her brother and him having the vehicle.

Q. What did you learn? A. She indicated to me in the early morning hours she observed headlights coming down her driveway. She got up. She first thought it was her sister. The vehicle turned around at a high rate of speed. She got in her own personal car and she chased after the vehicle. After about six miles, he finally pulled over. At this time she observed her brother, Allen, get out of the driver's seat and walk up to her. He informed her that he had stolen Mr. Overman's vehicle. It was her opinion that he was intoxicated. She also advised me that he had a cut to the back of his head and his right elbow was bleeding and she had no idea how that happened. She also requested that I do not file criminal charges on him and that was about the end of our conversation.

Trial counsel failed to object to this testimony. Hearsay evidence may establish a material fact at issue in a trial, if the court admits the evidence without objection. *Reid v. Automatic Elec. Washer Co.*, 189 Iowa 964, 976, 179 N.W. 323, 328 (1920). Thus, we can consider this evidence when examining the prejudice prong.

With this testimony in the record, we cannot say trial counsel's conduct in not objecting to the prosecutor's statement of law regarding the crime of theft is sufficient to undermine our confidence in the verdict. We say this because the only evidence in the record was the out-of-court statements regarding Clay's intent that he stole the vehicle and had the intent to take it to South Dakota. This evidence could lead a reasonable jury to conclude that Clay took the car for more than a joyride and is sufficient for the jury to find Clay had the intent to permanently deprive Overman of his vehicle. Therefore, this evidence does not undermine our confidence in the verdict, even if the court had properly instructed the jury that Clay had to have the intent to permanently deprive Overman of his vehicle in order to commit a theft.

However, our inquiry does not end here, because Clay also argues trial counsel was ineffective for failing to object to the admissibility of these out-of-court statements on the grounds of hearsay and the

Confrontation Clause. *See Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374, 158 L. Ed. 2d 177, 203 (2004) (holding the Confrontation Clause of the United States Constitution prohibits the use of testimonial hearsay evidence, unless the declarant testifies at trial or the right to confrontation is otherwise sufficiently honored).

Under Iowa law, we should look to the cumulative effect of counsel's errors to determine whether the defendant satisfied the prejudice prong of the *Strickland* test. We adopted this rule in *Schrier v. State*, 347 N.W.2d 657, 668 (Iowa 1984). *See also Bowman v. State*, 710 N.W.2d 200, 207 (Iowa 2006) (holding the prosecutor's persuasive misconduct throughout the trial and the defense attorney's failure to object was prejudicial under the *Strickland* prong of prejudice); *State v. Graves*, 668 N.W.2d 860, 883 (Iowa 2003) (same). In *Schrier*, a jury convicted Schrier of first-degree sexual assault and first-degree murder in the abuse and death of his two-year-old son. *Schrier*, 347 N.W.2d at 660. Schrier appealed the denial of his postconviction relief application in which he raised twelve claims of ineffective assistance of counsel. *Id.* at 660–61. We analyzed six of those claims under the essential duty prong. *Id.* at 661–67 (contending counsel neglected to call defendant as a witness and failed to object to jury instructions). We assessed the remaining claims under the prejudice prong. *Id.* (alleging failure of counsel to object to evidence, witness testimony, and jury instructions, in addition to failing to call several witnesses for the defense and claiming ineffective appellate counsel). We considered some claims, however, for both breach of an essential duty and prejudice. *Id.* at 665 (finding "[c]ounsel's failure to object to the evidence was not a breach of an essential duty or prejudicial"). Nonetheless, we analyzed all claims

"individually and cumulatively," concluding defense counsel was effective, and Schrier received a fair trial. *Id.* at 667–68.

In regards to Clay's claim that his counsel was ineffective for failing to object to these out-of-court statements, the first prong of the *Strickland* test requires us to decide if trial counsel failed to perform an essential duty by not objecting. If the challenged actions of counsel implicate trial tactics or strategy, we will not address the issue until the record is fully developed. *Rubino*, 602 N.W.2d at 563.

We know from the prosecutor's closing argument that VanEs was under subpoena, but did not show for trial. We also know Ashley was in the courthouse, and the prosecutor made a conscious decision not to call her because she was Clay's sister. What we do not know is whether trial counsel's failure to object to these statements was a trial tactic or strategy. Did trial counsel think the defense would be stronger if the testimony came in as hearsay, rather than live?[1] Until the record is developed as to trial counsel's state of mind, we cannot say whether trial counsel's failure to object implicated trial tactics or strategy.

Additionally, even if trial counsel's failure to object was a conscious trial tactic or strategy, the present record does not allow us to decide if such tactic or strategy was reasonable, under prevailing professional norms. VanEs's statement indicated Clay was taking the vehicle to South Dakota. Ashley's statement specified that Clay had stolen the vehicle. What we do not know is the source of these statements. Did VanEs and Ashley get their information from talking to Clay or did their statements include their opinions as to what transpired? We need to

---

[1]Although VanEs did not appear, the prosecutor had the option of asking the court to continue the matter and compel the witness to testify. *See generally* Iowa Code §§ 622.76–.77, .79 (2011).

know the source of the statements to determine if they would have been admissible had VanEs or Ashley actually testified. Consequently, at this time, we are not in the position to render an opinion on this or any of Clay's claims for ineffective assistance of counsel on direct appeal.

Finally, Clay also claims his trial counsel was ineffective when his lawyer failed to object to the prosecutor's rebuttal closing argument in which the prosecutor commented on nontestifying witnesses. The court of appeals decided this claim had no merit under the prejudice prong of *Strickland*. We vacate that finding, because Iowa recognizes the cumulative effect of ineffective assistance of counsel claims when analyzing prejudice under *Strickland*. *Schrier*, 347 N.W.2d at 668. In other words, if a claimant raises multiple claims of ineffective assistance of counsel, the cumulative prejudice from those individual claims should be properly assessed under the prejudice prong of *Strickland*. The court should look at the cumulative effect of the prejudice arising from all the claims. Thus, the proper practice when dealing with multiple ineffective assistance claims is as follows:

> 1. If the defendant raises only one claim of ineffective assistance of counsel, and the court finds trial counsel failed to perform an essential duty, but no prejudice arose from that breach, the court should dismiss that claim.
>
> 2. If the defendant raises only one claim of ineffective assistance of counsel, the court does not analyze the essential duty prong of *Strickland*,[2] and the court finds that even if counsel failed to perform an essential duty but no prejudice existed, the court should dismiss that claim.
>
> 3. If the defendant raises one or more claims of ineffective assistance of counsel, and the court finds trial

---

[2]The court always has the option to decide the claim on the prejudice prong of the *Strickland* test, without deciding whether the attorney performed deficiently. *State v. Maxwell*, 743 N.W.2d 185, 196 (Iowa 2008).

counsel performed an essential duty in an individual claim, the court should dismiss that claim.

4. If the defendant raises one or more claims of ineffective assistance of counsel, and the court finds trial counsel failed to perform an essential duty in any of the claims and that single failure to perform an essential duty meets the *Strickland* prejudice prong, the court should find for the defendant on that claim and deem counsel ineffective.

5. If the defendant raises one or more claims of ineffective assistance of counsel, and the court analyzes the prejudice prong of *Strickland* without considering trial counsel's failure to perform an essential duty, the court can only dismiss the postconviction claim if the alleged errors, cumulatively, do not amount to *Strickland* prejudice.

Therefore, Clay will have to bring all his ineffective-assistance-of-counsel claims in a postconviction relief action, because he raises multiple claims, some of which require further development of the record.

**V. Summary and Disposition.**

We affirm Clay's convictions for operating a motor vehicle without the owner's consent and operating a motor vehicle while intoxicated, second offense, because he did not appeal those convictions. We also affirm the court of appeals decision on the sufficiency of the evidence to support Clay's conviction for second-degree burglary. However, we vacate the court of appeals decision reaching the merits of Clay's ineffective-assistance-of-counsel claims. Accordingly, Clay may bring all three ineffective-assistance-of-counsel claims in a postconviction relief action.

**COURT OF APPEALS DECISION VACATED IN PART AND AFFIRMED IN PART; DISTRICT COURT AFFIRMED.**

All justices concur except Appel, J., who concurs specially, and Mansfield and Waterman, JJ., who separately concur specially.

**APPEL, Justice (concurring specially).**

I concur with the opinion of the court in all respects. I write separately to emphasize two points.

First, the court's opinion properly recognizes the relationship between ethical rules and ineffective-assistance-of-counsel claims under the Sixth Amendment of the United States Constitution and the independent provision of article I, section 10 of the Iowa Constitution. The relationship between ethical rules and ineffective assistance has been long recognized by caselaw. The Supreme Court of the United States recognized this in *Strickland,* and we recognized it in *Vance. See Strickland v. Washington,* 466 U.S. 668, 688, 104 S. Ct. 2052, 2064–65, 80 L. Ed. 2d 674, 693–94 (1984); *State v. Vance,* 790 N.W.2d 775, 785–86 (Iowa 2010); *see also Wheat v. United States,* 486 U.S. 153, 160, 108 S. Ct. 1692, 1697–98, 100 L. Ed. 2d 140, 149 (1988) (citing provisions of the ABA Model Code of Professional Responsibility and the Rules of Professional Conduct of the State Bar of California regarding multiple representation in analyzing an ineffective assistance claim); *People v. Cropper,* 152 Cal. Rptr. 555, 556–57 (Ct. App. 1979) (citing ABA ethical considerations and disciplinary rules related to zealous representation in an ineffectiveness case); *People v. DeFreitas,* 630 N.Y.S.2d 755, 759 (App. Div. 1995) ("In weighing constitutional claims of ineffective assistance of counsel in criminal cases, the courts have considered and have invoked ethical standards, recognizing that fidelity to those standards implicates not only the interests of the defendants, but the credibility of the system, its integrity, and the institutional interests in the rendition of just verdicts."). Thus, the use of ethical standards to illuminate whether a

lawyer has provided ineffective assistance is not novel or overreaching, but well established.

No one, of course, argues that a violation of an ethical rule always means that a lawyer has provided ineffective assistance. Nor does lack of an ethical violation always mean that ineffective assistance has not occurred. The point is, however, that professional norms may well illuminate the question of whether a lawyer has provided ineffective assistance. *See Roe v. Flores-Ortega,* 528 U.S. 470, 479, 120 S. Ct. 1029, 1035–36, 145 L. Ed. 2d 985, 996 (2000); *see also* Jenny Roberts, *Ignorance is Effectively Bliss: Collateral Consequences, Silence, and Misinformation in the Guilty-Plea Process,* 95 Iowa L. Rev. 119, 161 (2009) ("Although professional standards on their own may not adequately affect defense-counsel behavior, such standards are also woven into the constitutional landscape."); Erin N. Rieger, Note, *The Role of Professional Responsibility in the Ineffective Assistance of Counsel Claim in* Roe v. Flores-Ortega, 29 N. Ky. L. Rev. 397, 405 (2002) (arguing for the incorporation of the ABA's professional responsibility standards in judging the reasonableness of counsel's conduct).

Second, as noted in the comments to section 4-1.2 of the ABA Standards for Criminal Justice: Prosecution Function and Defense Function, a lawyer's knowledge must be "up-to-date." ABA Standards for Criminal Justice: Prosecution Function and Defense Function 4-1.2 cmt., at 123 (3d ed. 1993). While we give substantial deference to a lawyer's reasoned legal strategy, ignorance of important legal developments is not legal strategy entitled to deference but may be a precursor of ineffective assistance. It is not too much, for instance, to expect that a lawyer be aware of legal developments that dramatically undermine existing case law. We, of course, do not expect lawyers to be clairvoyant with respect

to how each and every case pending before the United States Supreme Court, or before this court, will be decided, but we do expect them to be informed of important legal developments and make reasonable judgments based on that knowledge.

In *Vance*, a few clicks of the mouse would have revealed that the holding in *New York v. Belton*, 453 U.S. 454, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981), was discredited, that the United States Supreme Court had granted certiorari to review its ongoing vitality, and that its validity was in substantial doubt. *See Vance*, 790 N.W.2d at 787–89. Yet, we properly could not find on the existing record that counsel was ineffective because we did not know whether counsel's failure to object was based upon a reasonable judgment that the evidence could have been admitted on another theory. *Id.* at 790.

I recognize that a criminal defense lawyer has a challenging assignment. Clients are as difficult as the situations in which they find themselves. The law can be complex. As in all human endeavors, no court can demand perfection. But we must require what the Iowa Constitution as well as the United States Constitution demands, namely, that a defendant be represented by a zealous, well-informed advocate who makes reasoned arguments and judgments based on up-to-date knowledge on behalf of his client. In this case, however, we cannot make the proper determination on the existing record, and as a result, I concur with the majority's disposition of the case.

**MANSFIELD, J. (concurring specially).**

I agree that Clay's convictions should be affirmed and that his ineffective-assistance-of-counsel claims should be preserved. However, I specially concur to express two concerns with the majority opinion. One relates to the interplay between ethical rules and ineffective assistance of counsel; the other to whether the prejudicial effect of separate errors by counsel can be accumulated for ineffective-assistance purposes.

In *State v. Vance*, this court seemingly linked the test for whether an attorney has provided ineffective assistance, thereby allowing the court to forgive a failure to preserve error, to the ethical standard for competence set forth in the Iowa Rules of Professional Conduct. 790 N.W.2d 775, 785–86 (Iowa 2010). The court quoted rule 32:1.1 as well as an official comment and a commentary on that rule before stating, "We will use these principles to determine if Vance's trial counsel failed to perform an essential duty." *Id.* at 786. The court then embarked on a lengthy but ultimately inconclusive discussion of whether it would be ineffective assistance for counsel to fail to advance an argument under the Iowa Constitution that was foreclosed by a binding precedent of this court. *Id.* at 789–90.

In the present opinion, my colleagues reiterate some of the court's language from *Vance*.

I think a fair assessment of our recent precedents is that they recognize a rather broad concept of what constitutes a failure to perform an essential duty for ineffective-assistance-of-counsel purposes. *See, e.g.*, *Ennenga v. State*, 812 N.W.2d 696, 702 n.5 (Iowa 2012); *Everett v. State*, 789 N.W.2d 151, 159 (Iowa 2010). It seems to me unwise and unfair, therefore, to suggest that a criminal defense attorney who "fails to

perform an essential duty" under one of our precedents has committed a violation of rule 32:1:1.

My second area of concern has to do with the majority's imposition of a requirement that cumulative prejudice be considered. The majority says, "We adopted this rule in *Schrier v. State*, 347 N.W.2d 657, 668 (Iowa 1984)." I think this is an overstatement. Schrier did raise multiple claims of ineffective assistance, which we analyzed one by one. *Id.* at 660–67. We then said at the end of our opinion:

> We have considered all issues and claims presented on appeal and can find no basis for reversing the judgment of the postconviction court denying relief to petitioner. In making this determination, we have reviewed the effect of the various claims both individually and cumulatively and find that it has not been established that petitioner was denied a fair trial. The judgment of the district court is affirmed.

*Id.* at 667–68. Respectfully, I believe it reads far too much into the brief statement—"we have reviewed the effect of the various claims individually and cumulatively"—to conclude it announces a "rule" that such claims *should* be analyzed cumulatively. There is no indication the issue was even raised in *Schrier*.[3]

Although my colleagues appear to be following the majority rule, the question has divided other courts. *See Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1269 (11th Cir. 2012) (stating that the prejudice inquiry "should be a cumulative one"); *Hooks v. Workman*, 689 F.3d 1148, 1188 (10th Cir. 2012) (applying a cumulative prejudice approach);

---

[3]The majority's two "see also" citations do not establish or even discuss such a "rule," either. *Bowman v. State* was based on *one* ineffective-assistance-of-counsel-claim—i.e., "failure of . . . defense counsel to object to the prosecutor's questions asking Bowman whether the State's witnesses fabricated their testimony at trial." 710 N.W.2d 200, 203 (Iowa 2006). We similarly analyzed *State v. Graves* as involving a single ineffective-assistance claim. 668 N.W.2d 860, 881 (Iowa 2003).

*Moore v. Sec'y Pa. Dep't of Corr.,* 457 F. App'x 170, 181 (3d Cir. 2012) ("Under *Strickland's* clear mandate, the prejudice of these errors is assessed cumulatively."); *Dugas v. Coplan,* 428 F.3d 317, 335 (1st Cir. 2005) (stating that *Strickland* "clearly allows the court to consider the cumulative effect of counsel's errors in determining whether a defendant was prejudiced" (quoting *Kubat v. Thieret,* 867 F.2d 351, 370 (7th Cir. 1989))); *Gersten v. Senkowski,* 426 F.3d 588, 611 (2d Cir. 2005) ("In evaluating prejudice, we look to the cumulative effect of all of counsel's unprofessional errors."); *Mackey v. Russell,* 148 F. App'x 355, 365 (6th Cir. 2005) ("[T]he *Strickland* test requires that prejudice be evaluated in light of the cumulative effect of all constitutionally infirm actions by counsel."); *Pizzuto v. Arave,* 385 F.3d 1247, 1260 (9th Cir. 2004) ("[I]ndividual deficiencies in representation which may not by themselves meet the *Strickland* standard may, when considered cumulatively, constitute sufficient prejudice to justify issuing the writ."); *Hough v. Anderson,* 272 F.3d 878, 891 n.3 (7th Cir. 2001) (stating that "prejudice may be based on the cumulative effect of multiple errors"). *But see Kennedy v. Kemna,* 666 F.3d 472, 485 (8th Cir. 2012) (stating that there is no cumulation of prejudice in the Eighth Circuit); *Fisher v. Angelone,* 163 F.3d 835, 852 (4th Cir. 1998) ("[I]t has long been the practice of this Court individually to assess claims under [*Strickland*]."); *Westley v. Johnson,* 83 F.3d 714, 726 (5th Cir. 1996) (noting that "[m]eritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised").

I would defer resolution of this question to a case where it has actually been briefed and argued to us. In any event, as I read the majority opinion, it does *not* decide the question whether *Strickland* prejudice can be tallied *across* proceedings. For example, if a defendant

files an application for postconviction relief alleging ineffective assistance of counsel, we are not deciding that the prejudicial effect of any errors alleged therein must be added to the prejudicial effect of any errors that were rejected in an earlier proceeding, such as a direct appeal, on the ground that *their* cumulative effect was insufficiently prejudicial.

Waterman, J., joins this special concurrence.