# IN THE COURT OF APPEALS OF IOWA

No. 22-2024
Filed November 8, 2023

**RODERICK E. WARD, Jr.,**
Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
Respondent-Appellee.
_____

Appeal from the Iowa District Court for Black Hawk County, David F. Staudt, Judge.

An applicant appeals the district court's denial of his request for postconviction relief concerning his conviction for second-degree murder. **AFFIRMED.**

Nathan A. Olson of Branstad & Olson Law Office, Des Moines, for appellant.

Brenna Bird, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee State.

Considered by Greer, P.J., and Schumacher and Ahlers, JJ.

**SCHUMACHER, Judge.**

Roderick Ward appeals the district court's denial of his request for postconviction relief (PCR) concerning his conviction for second-degree murder. Ward alleges he received ineffective assistance of counsel regarding his decision not to testify at trial.

## I.  Background Facts and Prior Proceedings

In 2014, Ward was charged with first-degree murder.  After a jury trial in 2015, Ward was found guilty of second-degree murder.  He was sentenced to a fifty-year term of incarceration with a mandatory minimum of seventy percent.  This court affirmed Ward's conviction.  *State v. Ward*, No. 16-0027, 2017 WL 1278288, at *4 (Iowa Ct. App. Apr. 5, 2017).  Our court summarized the facts:

> On August 1, 2014, Ward and his girlfriend, Katelyn Randall, invited people to their home for a gathering.  The decedent, Gary Wilson; Ward's uncle, Reggie Taylor; and Taylor's wife were in attendance along with a number of other individuals.  Wilson arrived at Ward's home in the afternoon, and Ward and Wilson were drinking alcoholic beverages throughout the day.  The gathering continued through the evening and night.  Ward and Wilson continued drinking. Wilson began acting obnoxious and aggressive, attempting to pick fights.  Wilson did not get physical with anyone but his behavior began to anger Ward.
> After most of the people had gone—only Ward, Wilson, Randall, Taylor, and Taylor's wife remained—Wilson's behavior continued and Ward became more angry.  Ward raised his voice at Wilson and told him to leave.  Ward held a shotgun as Ward and Wilson continued exchanging words.
> Randall testified she saw Wilson in the street in front of the house and Ward holding the shotgun and moving toward Wilson. Randall stated she turned to go inside because she "didn't want to see it if something were to happen."  As Randall reached the front door, she heard gunshots.  Randall turned to see Wilson and Ward both lying in the street.  She believed Ward had fallen down.
> Taylor was also outside at the time.  Taylor testified he was searching for a cigarette inside his truck when he heard the gunshots and ducked for cover.  When he looked up, Taylor saw Wilson lying in the street.  Taylor also saw Ward running from the scene.

Randall stated after she heard the gunshots she went inside to check on her children. Randall testified she saw Ward come into the house, retrieve a Denver Broncos blanket from the living room, leave the house, and retreat down the street.

Police and paramedics arrived on the scene and made lifesaving efforts, but Wilson did not survive his injuries. Police located five empty 12-gauge shotgun shells and a cell phone in the street near Wilson. The medical examiner testified Wilson sustained three gunshot wounds—one to the left forearm and two to the abdomen. The medical examiner stated the wounds were caused by a shotgun that was likely fired at fairly close range.

Ward was not at the house when police arrived, but later approached the line of police tape securing the scene. Officers detained Ward for questioning. The cell phone discovered in the street rang when officers called the number Ward provided during the interview. Bloodstains found on the pants Ward was wearing at the time he was detained matched Wilson's DNA.

The next morning a man walking along the street near Ward's house found a 12-gauge pump-action shotgun wrapped in a Denver Broncos blanket hidden in some bushes and alerted police. DNA testing confirmed several spots of blood on the shotgun matched Wilson.

*Id.* at *1.

In 2017, Ward filed an application for PCR, his first, arguing his trial counsel in his criminal case provided ineffective assistance of counsel. Following an evidentiary hearing, in which both Ward and his defense counsel testified, the court denied his application. This timely appeal follows.

## II. Standard of Review

We review ineffective-assistance-of-counsel claims de novo. *State v. Clay*, 824 N.W.2d 488, 494 (Iowa 2012).

## III. Ineffective Assistance of Counsel

Ward argues he is entitled to relief based on ineffective assistance of counsel. Ward's sole argument on appeal is that he was misinformed by counsel in making his decision not to testify, leading to his decision not being knowing,

voluntary, and intelligent. Ward states that his testimony was "critical to show unintentional recklessness rather than deliberate and intentional murder," and to support a conviction of involuntary manslaughter rather than second-degree murder. Ward also argues he did not wish to testify because he feared it would assist the State, and his trial counsel never discussed that fear or explained the benefits of testimony. He alleges that because of counsel's failure to explore his hesitancy to testify, "he was unaware of the benefits of testifying."

The *Strickland* standard requires establishment of its two-prong test to demonstrate the ineffectiveness of counsel: (1) counsel failed to perform an essential duty, and (2) prejudice resulted from this failure. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). Failure to prove either prong is fatal to an ineffective-assistance-of-counsel claim. *State v. Liddell*, 672 N.W.2d 805, 809 (Iowa 2003).

Under the first prong, we presume the attorney competently performed his or her duties. *State v. Ross*, 845 N.W.2d 692, 698 (Iowa 2014). An applicant must rebut the presumption of competence by showing by a preponderance of the evidence that "trial counsel's 'representation fell below an objective standard of reasonableness.'" *State v. Ondayog*, 722 N.W.2d 778, 785 (Iowa 2006) (quoting *Strickland*, 466 U.S. at 688). "Counsel breaches an essential duty when counsel makes such serious errors that counsel is not functioning as the advocate the Sixth Amendment guarantees." *Ross*, 845 N.W.2d at 698. This is more than a showing that a trial strategy backfired or that another attorney would try the case differently. *Id.*

To establish prejudice under the second prong, an applicant "must show a reasonable probability that the result of the trial would have been different." *State v. Ambrose*, 861 N.W.2d 550, 557 (Iowa 2015). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Ondayog*, 722 N.W.2d at 784 (quoting *Strickland*, 466 U.S. at 694).

A defendant has a constitutional right to testify at their criminal trial, and it is the duty of counsel to "advise the defendant about the consequences of testifying so that an informed decision can be made." *State v. Ledezma*, 626 N.W.2d 134, 146–47 (Iowa 2001). "Generally, the advice provided by counsel is a matter of trial strategy and will not support a claim of ineffective assistance absent exceptional circumstances. However, when a defendant follows the misinformed advice of counsel concerning the consequences of testifying, ineffective assistance of counsel may occur." *Id.*at 147. Additionally, "[m]iscalculated trial strategies and mere mistakes in judgment normally do not rise to the level of ineffective assistance of counsel. *Id.* at 143.

We are able to resolve Ward's appeal on the breach-of-essential-duty prong. Although Ward contends that he and his counsel failed to have substantive discussions on whether he should testify, the record belies this contention. Ward acknowledged that he had discussed testifying with his counsel and that their strategy was to "present our case and leave it in the jury's hands to make the decision." His counsel testified that as a public defender she followed the same procedure with each client and that included having conversations regarding testifying. Ward's defense counsel testified that she would have had ongoing

discussions with Ward over the course of the case on whether he would testify, and the trial record supports that.

Ward's counsel also discussed the strategy behind Ward not testifying. She stated that she believed Ward's testimony could have been detrimental to their theory of the case. Defense counsel argued Ward was intoxicated at the time of the shooting, but counsel worried Ward might appear to remember too much on the stand and "it would make him seem less intoxicated." And as noted by the district court, had Ward elected to testify he would be cross-examined about his statements to the police that he was not present when the shooting took place, the fact that five shots were fired, and the fact that he hid the shotgun.

The trial court record also supports Ward's defense counsel's testimony:

> THE COURT: Off the record we had also discussed . . . the issue of whether or not the defendant had opted to testify or more importantly whether he opted not to testify. And is it safe to say, [trial counsel], that you and the defendant have had ample opportunity to discuss this issue in anticipation of the trial, throughout the course of this trial, and . . . at the point where we discussed it off the record, on the eve of the [S]tate resting, and a decision was made that he was not going to testify?
>
> DEFENSE COUNSEL: That's correct, Your Honor. It's been an ongoing conversation I've had with Mr. Ward leading up to the actual commencement of trial as well as points during the trial I've checked in with him to see, I mean, explained to him that it's his right to testify and only he is the person who can make that choice. It's not anything that [co- counsel] or I can do.
>
> THE COURT: And so, Mr. Ward, just to confirm on the record, is it, in fact, your decision to not testify here today?
>
> WARD: Yes.
>
> THE COURT: And do you concur with the statements that were made by me, and more importantly by [defense counsel], that that's been an ongoing discussion between the two of you, and you feel, as you sit here now, that you have a knowing, intelligent, essentially a history and discussion of that, that you can make a knowing and intelligent decision?
>
> WARD: Yes.
>
> . . . .

THE COURT: And so as we sit here now, and with that understanding that if you wanted to testify we'd make that accommodation, it's your decision, based on you[r] conversations with counsel, that you do not want to testify.

WARD: Yes.

The record demonstrates that Ward and his trial counsel engaged in ongoing discussions about whether he should testify, and ultimately, Ward elected not to do so. We find no breach of an essential duty by Ward's trial counsel. *See Ledezma*, 626 N.W.2d at 143–47. We therefore do not address the prejudice prong of the *Strickland* test. We affirm the denial of Ward's PCR application.

**AFFIRMED.**