# IN THE COURT OF APPEALS OF IOWA

No. 24-0136
Filed May 21, 2025

**SEARCY LAVERNE WYATT,**
    Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
    Respondent-Appellee.

_____

Appeal from the Iowa District Court for Scott County, Tamra Roberts, Judge.

The applicant appeals the denial of his application for postconviction relief.

**AFFIRMED.**

Sara Pasquale of Pasquale Law, Ankeny, for appellant.

Brenna Bird, Attorney General, and Katherine Wenman, Assistant Attorney General, for appellee.

Considered without oral argument by Greer, P.J., Langholz, J., and Potterfield, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2025).

**POTTERFIELD, Senior Judge.**

After a bench trial led to convictions for one count of second-degree sexual abuse and one count of third-degree sexual abuse, Searcy Wyatt sought postconviction relief (PCR) alleging his trial counsel provided ineffective assistance. Specifically, Wyatt asserted trial counsel's representation was deficient in failing to (1) call additional witnesses on his behalf, (2) use exhibits he provided, and (3) adequately prepare him to testify at trial. The district court denied Wyatt's application, concluding he failed to establish his claims. Wyatt appeals, asking us to reverse the district court's ruling on the same claims of ineffective assistance of trial counsel.

**I. Background Facts and Proceedings.**

In 2017, M.B. disclosed that Wyatt—a father figure in her life—sexually abused her for approximately fifteen years beginning when she was five years old. Based on these allegations, the State charged Wyatt by trial information with committing a sex act against M.B. in 2001 when she was less than twelve years old (second-degree sexual abuse) and committing a sex act against M.B. in 2008 when she was twelve or thirteen years old (third-degree sexual abuse).

Wyatt maintained his innocence. He waived his right to a trial by jury and elected to proceed with a bench trial on the criminal charges.

The trial took place over two days in February 2019. M.B. testified about specific sex acts Wyatt committed against her beginning with putting his hand inside her underwear and rubbing her genitalia when she was five years, perpetrating oral sex on her when she was ten, requiring her to perform oral sex on him when she was twelve or thirteen, and later penetrating her vagina with his

digits and penis. M.B. admitted the only person she disclosed to as a child was her brother, who was about one year older than her. She did not tell anyone else in her family or at school; she did not disclose to a therapist she saw as a child or workers from the Iowa Department of Human Services (DHS) who were involved with her family. M.B.'s brother also testified, agreeing that M.B. told him when they were children that Wyatt touched her inappropriately and that he did not share the information with anyone else.

The State introduced text messages sent between Wyatt and M.B. before her disclosure and Wyatt and several family members after the disclosure, arguing the messages supported M.B.'s allegations. Wyatt sent messages to M.B. stating, "I could chew on you all day, if only" and "I'll make sure to bring you something chocolate home, besides myself." After the allegations, when family members suggested Wyatt had caused M.B. harm, Wyatt did not respond with denials—instead he said, "I apologize for it all, bro" and "I made a major mistake."

Wyatt testified in his own defense. He denied committing sex acts against M.B. He suggested the messages being highlighted were handpicked, out of context, and taken in the wrong light as they were inside jokes the family shared. Wyatt testified about his positive relationship with M.B. and her brother and the fatherly role he played in their lives.

Ruling orally from the bench, the district court found Wyatt guilty of both charges. The court explicitly found M.B. credible, noting her testimony was detailed, corroborated in some respects by other witnesses, and that there was no suggested motive to explain why she would come forward with the allegations if they were untrue. And the court "did not find the defendant's testimony credible at

all." Wyatt was later sentenced to a term of incarceration not to exceed twenty-five years and a term of incarceration not to exceed ten years, with the two to be served consecutively for a total not to exceed thirty-five years.[1]

Wyatt filed a PCR application seeking a new trial in October 2022. He alleged ineffective assistance of trial counsel, asserting counsel was deficient in failing to (1) call additional witnesses on his behalf, (2) use exhibits he provided, and (3) adequately prepare him to testify at trial. Following an evidentiary hearing, the district court concluded Wyatt failed to establish any of the three claims and denied his application.

Wyatt appeals.

**II. Standard of Review.**

"We typically review postconviction relief proceedings on error. However, when the applicant asserts claims of a constitutional nature, our review is de novo. Thus, we review claims of ineffective assistance of counsel de novo." *Ledezma v. State*, 626 N.W.2d 134, 141 (Iowa 2001) (internal citations omitted).

**III. Discussion.**

To succeed on a claim of ineffective assistance the applicant "must show by a preponderance of the evidence that his trial counsel failed to perform an essential duty and prejudice resulted." *State v. Ondayog*, 722 N.W.2d 778, 784 (Iowa 2006). In evaluating his claims, "[w]e presume performance of counsel falls

---

[1] On direct appeal, Wyatt challenged only the sentence imposed, and the State agreed the district court applied some statutes that became effective after Wyatt's criminal acts took place. In a court order, our supreme court reversed portions of Wyatt's sentence and remanded for resentencing. The district court filed an order correcting Wyatt's sentence on January 2, 2020.

within a range of reasonable professional assistance." *Id.* at 785. It is Wyatt's burden "to rebut this presumption with evidence [that] his trial counsel's 'representation fell below an objective standard of reasonableness.'" *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). "The resulting prejudice element of an ineffective assistance claim is satisfied if a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 784 (cleaned up). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694).

While Wyatt's claim fails if he is unable to prove either the breach or the prejudice prong, *see id.,* we "look to the cumulative effect of counsel's errors to determine whether the defendant satisfied the prejudice prong of the *Strickland* test." *State v. Clay*, 824 N.W.2d 488, 500 (Iowa 2012).

**A. Additional Witnesses.**

Wyatt asserted counsel's representation fell below an objective standard of reasonableness when counsel failed to call additional witnesses to testify in his defense. Broadly, these witnesses were split into two groups—DHS workers and Wyatt's nieces. We consider the two groups separately.

**DHS workers.** As part of his defense during the underlying criminal trial, Wyatt called DHS worker Cynthia Reed. Reed testified she investigated the family for a possible domestic violence issue in 2011; as part of that investigation, she met with M.B. at school—outside the presence of Wyatt. Reed asked M.B. directly whether there was any inappropriate touching, and M.B. denied it. Reed also

spoke to M.B.'s brother, who similarly denied Wyatt engaged in any inappropriate physical contact.

In the PCR action, Wyatt claimed there were three additional DHS workers he wanted trial counsel to call as witnesses: Kathy Garrett, Sue Messer, and Rachel Ward. Wyatt testified that each of the three witnesses were DHS workers who spent significant periods of time with M.B. and her brother in and out of the family home when they were children. He stated he wanted them to testify:

> Because they were there for some years, some time, and they spent a lot of time. And then they also took me to court. They went to court with me so it would be said that, you know, I was okay to be with [M.B.], [her brother] and raise them and everything. And they would support me. And they was there, and they was in the family setting and dealing with us on a constant basis for a long while, so.

When asked about it at the PCR hearing, trial counsel testified he attempted to locate the witnesses but was unable to do so. Counsel confirmed with DHS that Sue Messer had worked for the department in the past, but by the time of the 2019 criminal trial, Messer was retired and living out of state. The department did not provide a way to contact her. DHS denied anyone named Kathy Garrett ever worked for the department. Trial counsel recognized Wyatt may have encountered Kathy as part of the DHS case: "[W]hat's often misunderstood by defendants is that they believe that if they've met with them through a DHS case that they're DHS employees. Unfortunately, it doesn't mean that at all. . . . [T]here's several other agencies that work with DHS that are not DHS." Still, trial counsel was unable to locate her. Regarding Rachel Ward, at the time of the criminal trial, Wyatt only provided counsel with the name "Miss Rachel"—no last name. Counsel asked DHS about a possible "Miss Rachel" but the department was unable to

provide contact information, and trial counsel was unable to conduct a broader search without a last name or other information.

The district court found trial counsel's testimony credible as to the efforts made—including use of a private investigator—to locate the potential witnesses. The court recognized it was Wyatt's lack of information regarding the actual employers of two of the women, Miss Rachel's last name, and the spelling of "Kathy Garrett"[2] that impeded trial counsel's ability to find and subpoena them. Like the district court, we conclude Wyatt failed to establish that counsel was deficient in failing to secure Kathy Garrett, Sue Messer and Rachel Ward as defense witnesses. *Cf. Ledezma*, 626 N.W.2d at 142 (recognizing that breach of duty "is more likely to be establish when the alleged action or inactions of counsel are attributed to a lack of diligence").

**Nieces.** At the PCR trial, Wyatt testified he wanted trial counsel to call four of his nieces as witnesses in the underlying criminal trial. Wyatt explained the nieces visited the family home regularly throughout their lives; he expected them to testify about, "[j]ust, you know, my character, how I was, you know, what they see, how the house situation was set up, and things of that nature." He expected them to say that M.B. never disclosed anything to them and "how [he] conducted [him]self with them."

Trial counsel testified that he did not remember Wyatt asking him to call the nieces as witnesses. But even if Wyatt did, he explained his concerns with doing so. At the time of the 2019 criminal trial, Wyatt had been previously convicted of

---

[2] It is still not clear if this spelling accurately reflects the name of the person Wyatt sought to subpoena.

three counts of lascivious acts with a child (in 1993); those acts, to which Wyatt

pled guilty, involved his then-girlfriend's children. Trial counsel had filed a motion

in limine seeking to exclude the information from trial, and the State agreed it would

not bring up his prior convictions in its case-in-chief. The issue, then, was not

"opening the door" to the evidence.

> As trial counsel testified at the PCR trial,

> [I]t's in the best interest of a client, particularly in a sex abuse case, that we not show what the law disallows, which is a propensity to do certain acts, which makes him very vulnerable. It is incredibly damning evidence, I think, in a sex abuse case to hear that your client has prior sex offender history, particularly as it results in convictions. . . . And I think that the minors that he . . . committed the [lascivious] acts against . . . were around the same age, I believe, as [M.B.] at the time the allegations, I think, were to have started. So where it's significant to me is it dictates what witnesses I can call and what issues I can delve into.
>
> > . . . .
> > In a case like this, with a conviction of prior sex offenses, bringing his character into issue would be the worst thing I imagine possible as far as evidence against him. Bringing in family members or friends who are going to say nice things about you and that they didn't observe you sexually assaulting an individual, on the grand scale of things, I don't think has tremendous weight, particularly, when juxtaposed against the fact that it would make him vulnerable to his prior record coming at issue if we say he's a good guy, not capable of this conduct, when, in fact, he's been convicted of this conduct. I think that evidence is so damaging that it, essentially, supersedes anything that could come out of character evidence.

The PCR court rejected Wyatt's claim trial counsel was ineffective in not securing

the testimony of his nieces, ruling:

> [A]ny testimony about Wyatt's character would have resulted in admission of [Wyatt's] prior sexual abuse convictions by the State. The price to exclude the prior sexual abuse convictions and Wyatt's sexual offender registry requirements comes in exchange of leaving out evidence of good character. Testimony that Wyatt was okay to be around kids is the exact character evidence he forfeited to exclude the damning evidence the State would rebut. [Trial counsel] was

wise to try to exclude the prior convictions and was careful not to push the parameters that would have allowed for its admission.

Insofar as Wyatt ever asked trial counsel to call his nieces as witnesses,[3] we agree with the PCR court that it was a reasonable strategy to avoid calling witnesses who could open the door to information about Wyatt's previous lascivious-acts convictions involving a paramour's children. *See Ondayog*, 722 N.W.2d at 786 ("[W]e do not delve into trial tactics and strategy 'when they do not clearly appear to have been misguided.' In other words, 'we will not reverse where counsel has made a reasonable decision concerning trial tactics and strategy, even if such judgments ultimately fail.'" (citations omitted)); *Taylor v. State*, 352 N.W.2d 683, 685 (Iowa 1984) ("In deciding whether trial counsel's performance was deficient, we require more than a showing that trial strategy backfired or that another attorney would have prepared and tried the case somewhat differently."). This was not a breach of duty.

### B. Exhibits.

Wyatt claimed trial counsel breached an essential duty when he did not use family photos and videos Wyatt provided as exhibits in the underlying criminal trial. While these photographs and videos were still not introduced at the PCR trial, Wyatt testified they were from an amusement park, a local air show, and other events; he thought they established "how we interacted with one another, how. . . we were laughing all the time, how everything . . .it was, you know, in our family setting."

---

[3] The district court did not make a fact-finding one way or the other.

The PCR court concluded trial counsel did not breach a duty in failing to introduce the evidence at the underlying criminal trial because even if counsel had sought to admit the evidence, "it is unlikely that it would have been admitted, as it is not relevant." We agree. As at least one witness testified at the criminal trial, the fact that a person perpetuates sex acts against a child does not foreclose an otherwise close, "tight-knit" relationship between the adult and child. Put another away, the pictures and videos apparently showing M.B. and Wyatt sharing positive experiences in the community does not make it less likely that Wyatt committed the sex acts M.B. described. *See* Tyler J. Buller, Essay, State v. Smith *Perpetuates Rape Myths and Should Be Formally Disavowed*, 102 Iowa L. Rev. Online 185, 199 (2017*)* ("Whether victims have positive feelings for their abusers has nothing to do with whether the sexual abuse occurred. 'The clinical literature discloses that in intrafamilial abuse cases, many abused children are ambivalent about the abuser, feeling warmth and anger at the same time. It is not uncommon for abused children to want to live with and demonstrate affection toward the abusive parent.'" (footnote omitted)); *see also* Iowa R. Evid. 5.401 (providing evidence is relevant when "it has any tendency to make a fact more or less probable than it would be without the evidence[] and . . . [t]he fact is of consequence in determining the action").

The family photos and videos Wyatt wanted counsel to introduce at trial were not relevant, so trial counsel did not breach a duty by not seeking their admission. *See* Iowa R. Evid. 5.402 ("Irrelevant evidence is not admissible"); *State v. Graves*, 668 N.W.2d 860, 881 (Iowa 2003) ("Trial counsel has no duty to raise an issue that has no merit.").

**C. Prepare to Testify.**

Last, Wyatt claimed trial counsel's representation fell below an objective standard of reasonableness because counsel failed to prepare him to testify in his own defense. Wyatt elected to and did take the stand; he asserts he should have been better prepared to testify.

At the criminal trial, counsel and Wyatt engaged in the following colloquy:

> Q. We have had a number of conversations regarding whether or not you would testify today, is that correct?  A. Yes.
> Q. And we talked about sort of the pros and cons of your testimony?  A. Yes.
> Q. It was expressed to you if you testify, certainly you have an opportunity to express yourself, you are susceptible to cross-examination by the State?  A. Yes.
> Q. And you fully understand that, correct?  A. Yes.
> Q. We talked about Rule 504(b), which is a Rule of Evidence, correct?  A. Yes.
> Q. We talked about how issues of that evidence recovered before the proceedings here might be admitted by way of a motion in limine, correct?  A. Yes.
> Q. There are concerns in the event that something was opened, the door, the State would be able to go after the 504(b) evidence even that was excluded?  A. Yes.
> Q. Were any questions about whether or not you would testify been answered by me?  A. Yes.
> Q. Do you have any further questions?  A. No.
> Q. Do you understand you have the right against self-incrimination, which in essence provides that you cannot be forced to testify by myself, the State or the bench?  A. Yes.

This colloquy establishes that Wyatt and trial counsel had several in-depth discussions about whether he would testify and the possible pitfalls of doing so. We recognize the distinction between making the decision to testify and being prepared to testify. But Wyatt has not articulated what additional preparation he believes he was owed. Without more, Wyatt has not established that counsel's representation was outside the range of normal competency. *See DeVoss v.*

*State,* 648 N.W.2d 56, 64 (Iowa 2002) ("[T]here is a strong presumption trial counsel's conduct fell within the wide range of reasonable professional assistance."); *Runyan v. State*, No. 03-1775, 2005 WL 1629956, at *3 (Iowa Ct. App. July 13, 2005) ("Claiming counsel should have done a better job is not enough; specific ways in which counsel was inadequate are required.").

## IV. Conclusion.

Wyatt failed to establish that counsel breached an essential duty in any of the three claims he raised, so we need not consider the alleged cumulative prejudice he suffered. *See Clay*, 824 N.W.2d at 500. We affirm the district court's denial of his PCR application.

**AFFIRMED.**