# IN THE COURT OF APPEALS OF IOWA

No. 15-1530
Filed March 8, 2017

**SAMUEL MONTEZ WRIGHT,**
Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
Respondent-Appellee.
_____

Appeal from the Iowa District Court for Woodbury County, Edward A. Jacobson, Judge.

The applicant appeals from the district court's denial of his application for postconviction relief. **AFFIRMED.**

Zachary S. Hindman of Mayne, Arneson, Hindman, Hisey & Daane, Sioux City, for appellant.

Thomas J. Miller, Attorney General, and Sharon K. Hall, Assistant Attorney General, for appellee State.

Considered by Vaitheswaran, P.J., and Potterfield and Bower, JJ.

**POTTERFIELD, Judge.**

Samuel Wright appeals from the district court's denial of his application for postconviction relief (PCR). Wright maintains there is newly discovered evidence that warrants a new trial, and he raises several issues regarding the effectiveness of previous counsel.

## I. Background Facts and Proceedings.

A panel of our court found the facts as follows on Wright's direct appeal:

On January 17, 2008, two hunters discovered the frozen, shirtless, dead body of Zachary Cooper lying face down on a dirt road, near Lawton—about ten miles east of Sioux City. Cooper had been shot twice.

Wright was subsequently prosecuted for robbing, kidnapping, and murdering Cooper. The State's evidence showed that on January 15, 2008, Wright, Jeremy Williams, Nick Perez, Ray Dukes, Teddy Case, Matthew Dean, and one other individual named "Wayne" were hanging out in Perez's Sioux City apartment. While sitting around, various individuals in the group decided that they wanted to smoke some marijuana. Therefore, Perez volunteered to contact his friend Cooper about purchasing a quarter pound of marijuana. Cooper lived in a house about a block away that belonged to David Myers's father.

Dean and Case both testified they heard some discussion in the group about robbing Cooper. They claimed Wright was part of the discussion. Dukes testified that he heard Case and Perez talk about a robbery. Dean testified that Dukes was in on "the talk about robbing" Cooper. Case admitted he had previously testified in deposition that the plan to rob Cooper came from Dukes, among others. However, Dean and Case (as well as "Wayne") left Perez's apartment before any marijuana was delivered.

After Perez visited with Cooper regarding the possibility of buying marijuana, Cooper went to Perez's apartment to make sure the group had enough money to pay for it. According to Myers, who was with Cooper that afternoon, Cooper was nervous about dealing with Perez. However, when Cooper returned from Perez's apartment, he told Myers everything was all right, explaining that just Perez, Wright, and Williams were there, and that he "saw the money."

Perez went to visit Cooper again (this time with Williams) to finalize the deal. According to Perez, during this meeting, Cooper stated that he "wanted to make sure things go straight. If things

boil down wrong then he would have to do something to [Williams] and his family." Williams then replied, "Dude, don't threaten my f——ing family." Cooper answered that he wasn't threatening Williams's family. Perez attempted to calm Williams down and eventually they left and walked back to Perez's apartment. On the walk home, Williams was still angry about the threat and stated, "Oh, I got this."

According to Myers, Cooper obtained the marijuana from his source, left for Perez's apartment around 6:30 or 7:00 p.m., and never returned. Perez and Dukes testified at trial as to what happened next, although there were a number of discrepancies between their respective narratives.[1]

Perez testified that once Cooper arrived at the apartment with the marijuana, Wright pulled out a gun. According to Perez, Williams had been outside moving his car (a Mercury Marquis), but he came running in and "punched Zachary Cooper, like three times in the face. And the second and third time he punched, Zach's nose started streaking blood." Perez further testified that Dukes exited the bathroom after Cooper was knocked down and asked, "[W]hat the hell is going on?" After seeing Cooper's bloody face, Dukes said, "Oh s——. I'm staying out of this." Perez testified he too "was all scared," and "was freaking out." He ran into the bathroom and locked the door. After a minute or two, Williams began banging on the bathroom door telling Perez to come out. When Perez left the bathroom, Williams told Perez to go wait out in his car and threatened "you better not screw us over or I'm going to screw your life over." The car doors were locked, so Perez waited next to the vehicle until everyone else came outside. At that point, Wright, wielding the gun, told him to get in the vehicle along with the others.

Dukes testified that after Cooper arrived with the marijuana, Williams started punching him. Dukes testified that Wright also "started swinging on [Cooper] and pulled the gun out." According to Dukes, Wright and Williams made Cooper take off his shirt to be sure he wasn't wearing a wire.[2] Wright and Williams then led Cooper, bloody and shirtless, out of the apartment and into the car. Wright had his gun trained on Cooper. Wright and Williams also told Dukes to get in the car. Dukes testified he did so "cuz I didn't want to get shot."

---

[1] Not only did their trial testimony differ on a number of points, but Wright's counsel was also able to point out that both of them had given prior statements inconsistent in various respects with their trial testimony.

[2] Dukes admitted he had previously testified in deposition that Perez searched Cooper after his shirt had been removed and found a mace (ball and spiked chain) in his pocket. According to Dukes, Perez pulled out the mace and put it on the table.

Williams drove the car, with Perez in the front passenger seat, and Dukes, Cooper, and Wright from left to right in the rear. Cooper's blood was later found in the middle rear of the car where both Perez and Dukes testified he had been sitting. According to Perez, when Wright entered the vehicle he said to Williams, "you know where to go, just start driving."

Wright forced Cooper to keep his head down. Perez testified that Cooper was praying for his life. Perez also testified that Wright observed a tattoo on Cooper's chest, which he thought was a sign for the Antichrist, and told Cooper he was "going to put the devil in his grave." Dukes testified that Williams commented he was "going to show [Cooper] what to do when you threaten people's family." Perez also recalled Williams saying, "Nobody threatens me and my family and gets away with it."

Williams drove the car into rural Woodbury County. Eventually, Williams stopped the car in a rural farm driveway off of 170th Street near Lawton. Perez testified that Wright told Williams to leave the headlights on because "he was going to do it like a movie on Showtime." Perez remained in the car, but he recalled that Dukes momentarily left the car to smoke a cigarette and go to the bathroom. Perez testified that Wright and Williams had Cooper kneel down in front of the car and put his hands on the hood. According to Perez, Wright had to manually load the gun. Wright shot Cooper, and Cooper fell from his view. Wright then handed the gun to Williams, they reloaded the gun, and Williams also shot Cooper.

Dukes testified that when the car stopped near Lawton, he was directed out of the vehicle so Cooper could get out on his side. Dukes recalled that Wright handed his gun to Williams, and told him "to do what he do." Williams then shot Cooper. Dukes testified that when Williams shot Cooper, Wright had his hand on his shoulder telling him he "was going to watch." Williams gave the gun back to Wright. Wright had to reload the gun with a single bullet because it was missing its clip.[3] Wright then stood over Cooper's body and shot him as well.

On the drive home, both Perez and Dukes testified that they were warned to stay quiet. According to Perez, when he commented that it was stupid for Wright and Williams to have shot Cooper, Wright directed Williams to stop the car, put the gun against the back of his head, and said, "If [Perez] want to talk we can take him out right now and do him too." Dukes testified that Wright told him that "he will kill my son" if he (Dukes) told anyone.

When the group returned to Sioux City, Williams stopped at a Kum & Go for gas. Williams and Perez were caught on the

---

[3] The State's ballistics expert demonstrated how a .380 caliber handgun could be loaded and fired one bullet at a time without a clip.

surveillance video inside the store. Surveillance photography taken outside the store showed Williams' car and four individuals. Although the outside images were dark and fuzzy, at trial, Perez and Dukes identified Wright as one of the individuals.

The foursome then returned to Perez's apartment where Wright and Williams cleaned Cooper's blood off of the wall. According to Perez, Cooper's clothes and the gun were placed into a garbage sack and thrown into ["the garbage dumpster that was outside of somebody's yard on the curb."] Perez, Wright, and Williams then went over to "Wayne's" to smoke the marijuana taken from Cooper, while Dukes went to his girlfriend's house.

Around 10:30 or 11:00 p.m., Perez's mother arrived at Perez's apartment to stay the night. She noticed a strong odor of cleaning fluid. Wright and Williams were present, and Williams was "acting really nervous." She also testified that when [he] went to bed, Perez "came over and gave me a big hug and . . . he just said that he was sorry for getting involved with the wrong people and causing problems and that something bad had happened."

As noted, Cooper's frozen, shirtless body was discovered two days later lying face down in the snow. Apparently, Cooper did not die immediately from his wounds, but was able to walk approximately three-quarters of a mile before he collapsed and died. Police immediately began investigating the murder scene, and the following day discovered two .380 caliber shell casings and a .380 caliber bullet. At trial, the State offered evidence that in September 2007, a search of Wright's apartment had uncovered seventeen rounds of .380 caliber ammunition. The State also offered evidence that Wright had offered to sell someone a handgun that was either a .357 or a .380 with no clip in August or September 2007.

Despite the cleaning efforts, Cooper's blood was found on an envelope on the living room bookshelf of Perez's apartment. Cooper's blood was also found on Williams's coat sleeve and left breast pocket.

Wright was interviewed by police on January 20. He claimed he had not left his home at all on the 15th, claimed he did not know Dukes, claimed he did not know where Lawton was, and claimed he had never met Cooper in his life. A recording of this interview was played for the jury at trial.

On January 28, 2008, Wright was charged by trial information with first-degree murder, first-degree kidnapping, and first-degree robbery. . . .

Trial commenced on August 13, 2008. . . .

. . . .

Wright subsequently took the stand in his own defense. He denied robbing, kidnapping, or murdering Cooper. He denied that he was the fourth person shown on the Kum & Go surveillance

photographs. He testified that he was at Perez's apartment early on the evening of January 15. However, he claimed that he left by foot to go to his old apartment prior to Cooper's arrival at Perez's place and never even saw Cooper that evening. Wright testified that after he left Perez's apartment, he walked down the street where he met a friend "Troy" and decided to help him move. Wright did not provide Troy's last name. Troy did not testify.

To explain how his cell phone might have been in Lawton when and where Cooper was murdered, Wright testified that he had inadvertently left that phone behind and that he recovered it from Williams's car later that night. To explain why Perez's mother saw him late at night at Perez's apartment, Wright testified that after helping Troy move, he needed to be picked up by his girlfriend. According to Wright, he walked the six blocks from Troy's apartment to Perez's apartment in order to save his girlfriend six blocks of driving. To account for why Perez's mother smelled a strong odor of cleaning fluid when she returned to Perez's apartment late on the evening of January 15 (and saw Wright), Wright claimed that he told Perez that day to clean up his apartment "for your momma" and "spray some smell good."

To try to establish an alibi, Wright also offered the testimony of his girlfriend that she had encountered Wright alone between 6:00 and 6:30 p.m., and again around 9:30 p.m. on the 15th when she picked him up outside Perez's apartment.

The State played the DVD of Wright's original police interview where he made a number of statements that were inconsistent with Wright's trial testimony, including that he had not left his place at all on the 15th.

Both parties had previously proposed that versions of Iowa's accomplice corroboration instruction be given to the jury.[4] However, at the conclusion of the evidence, the district court declined to give such an instruction, stating that it "just doesn't find anything in the record of significance and far less than what would be necessary to make these two fellows [Perez and Dukes] an accomplice." Wright objected to the court's failure to give the accomplice instruction.

The case was submitted to the jury, and Wright was found guilty on all three counts. Wright was sentenced to incarceration

---

[4] This instruction provides, among other things, that a person cannot be convicted "only by the testimony of an accomplice," and that there "must be other evidence tending to connect the defendant with the commission of the crime." *See* Iowa Crim. Jury Instruction 200.4. Both the prosecution and the defense version of this instruction would have instructed the jury that if they found Dukes or Perez to be an accomplice, they could not convict Wright only by that testimony.

The district court later observed that the State submitted its accomplice instruction before any evidence had been received. It noted that Williams went to trial before Wright and, as part of his defense, had testified that Dukes had been a shooter.

for life on the murder and kidnapping convictions, and to an indeterminate term of twenty-five years for his robbery conviction.

*State v. Wright*, No. 08-1737, 2010 WL 200052, at *1–6 (Iowa Ct. App. Jan. 22, 2010).

Following his conviction and unsuccessful direct appeal, Wright filed an application for postconviction relief in August 2010. In April 2011, he amended the application. A hearing was held on April 23, 2015, following which the district court denied Wright's application. Wright appeals.

## II. Standard of Review.

Generally, we review PCR actions for correction of errors at law. *Millam v. State*, 745 N.W.2d 719, 721 (Iowa 2008). However, we review claims of ineffective assistance de novo. *Id.*

## III. Discussion.

### A. Newly Discovered Evidence.

At the PCR hearing, Wright's attorney submitted depositions from two witnesses who claimed Duke had told them—sometime after Wright's conviction—that he (Duke) had shot Cooper. Wright maintains Dukes's purported admissions constitute newly discovered evidence that warrants a new trial.[5] In the alternative, he maintains that if the admissions themselves do not warrant a new trial, the admissions would have compelled the court to grant Wright's request for an accomplice instruction and giving the jury the instruction would probably have changed the result of the trial.

---

[5] As the district court did, we note that this newly discovered evidence only pertains to Wright's murder conviction.

A person may apply for postconviction relief if "[t]here exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice." Iowa Code § 822.2(d) (2011). In order to prevail, the applicant must show:

> (1) that the evidence was discovered after the verdict; (2) that it could not have been discovered earlier in the exercise of due diligence; (3) that the evidence is material to the issues in the case and not merely cumulative or impeaching; and (4) that the evidence probably would have changed the result of the trial.

*More v. State*, 880 N.W.2d 487, 499 (Iowa 2016).

Here, the State does not dispute the evidence was discovered after the verdict, that it could not have been discovered before the verdict, and that the evidence itself is material to the issues in the case—namely, which person or persons shot Cooper. The fighting issue is whether the evidence probably would have changed the result of the trial. "The standard for whether the evidence probably would have changed the result of the trial is a high one because of the interest in bringing finality to criminal litigation." *Id.* "[T]he inquiry is whether, based upon all the evidence, the verdict probably would have been different in the case before us. The question, of course, is case specific and fact intensive." *Id.* at 510 (citation omitted).

In one of the submitted depositions, Paige Mathison testified:

> A. . . . [Dukes] was drinking, and he was just acting weird. And I asked him what was going on.
> Q. What did he say? A. He's uncomfortable with what happened. And I sat down and I'm like what are you talking about? And he's like this thing with Zach [Cooper] wasn't supposed to happen the way it did.
> Q. And did you ask him what he meant by that? A. Yes.
> Q. And what did he say? A. And he said it was just supposed to be a simple, you know, robbery I guess you would say.

He worded it in a different way. And then I kept asking him what are you talking about? I don't understand. And he said they were just supposed to go over there, take the weed, he wasn't supposed to get beat up. We weren't supposed to take him out and do everything we did to him. And I go what are you talking about? What did you do? He's like, well, we did beat him up and we took him, we kidnapped him. We took him out past Menard's or something, he said out into a deep, deep like cornfield or something, and they basically took turns shooting him, and—

Q. During this conversation did he admit to shooting Mr. Cooper? A. Yes. The way he said was almost like a dream to him. He closed his—it's like he closed his eyes, and in his dream he pulled the trigger, but he thought—he didn't think it was real, and when he opened his eyes he said he shot him.

In the other deposition, Gerry Patterson testified:

Q. Mr. Patterson, have you ever had any conversation with Ray Dukes about [the murder]? A. Yes.

. . . .

Q. Could you describe the conversation for me? A. I asked him what happened that night.

Q. How did he respond? A. Emotionally. He said—he said he was forced to do something he didn't want to do. He said that if he didn't do it, the other people that was mainly in the situation said that they were going to harm him and his kids.

Q. And when he said he did something he didn't want to do— A. Which is shoot Zach [Cooper].

Q. Okay. And how did you respond when he told you? A. I was shocked. I asked him—I asked him what happened, and he said if he didn't shoot Zach, that [Wright][6] and them would come to him after his family, and I told him nothing was going to happen like that.

. . . .

Q. Okay. Did he say anything else to you about who shot Mr. Cooper? A. He said they all did.

We consider the alleged recantation of Dukes's testimony with skepticism. *See Jones v. State*, 479 N.W.2d 265, 275 (Iowa 1991) ("We have repeatedly held that a witness' recantation testimony . . . is looked upon with the utmost suspicion."). We note that the PCR court "is certainly not required to believe the

---

[6] Patterson identified Wright by his nickname, which includes a statement of race.

recantation," and we think there are several reasons to question the veracity of the statements here. *See id.* First, we note that Dukes was not called to testify at the PCR hearing, and we have no record of Dukes being asked to account for these statements by Mathison and Patterson. Additionally, Patterson's claim that Dukes said "they all did" shoot Cooper is inaccurate on its face. By all accounts, four men were in the car with Cooper, and he was shot twice; at most, two of the men shot him. Moreover, if "they all did" shoot Cooper, then Patterson's account reaffirms Wright's conviction rather than calling it into question because Patterson placed Wright at the scene of the murder. We also note that both Mathison and Patterson gave their depositions from jail, pending federal criminal charges. The record is not clear what charges either faced, but we note that if either committed crimes of dishonesty, the jury would have been free to discount their statements. *See* Iowa R. Evid. 5.609(a)(2) ("For the purpose of attacking the credibility of a witness: [e]vidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment."); *see also State v. Parker*, 747 N.W.2d 196, 206 (Iowa 2008) ("The rationale behind this general impeachment rule is that evidence of the moral qualities of a witness can cast light on the probability of the truthfulness of the testimony.").

Even if the jury had been able to consider Dukes's purported statements about his role in the murder, we cannot say the result would probably have been different. Neither Patterson's nor Mathison's statement clears Wright; even if the jury believed Dukes was one of the shooters, it was still likely to believe Wright was the second shooter. The jury heard evidence that it was Wright's gun that

was used in the shooting, Perez's testimony still named Wright as one of the shooters,[7] and even Patterson's statement of Dukes's admitted involvement included the claim that Dukes shot Cooper because "if he didn't shoot Zach, that [Wright] and them would come to him after his family."

Plus, as the PCR court noted, the deposition testimony of Patterson was at odds with Wright's testimony and defense. Wright's defense was not that he was present but others did the shooting; he always maintained that he was not there at the time of the robbery or the murder. But Patterson's testimony placed Wright there and, as noted above, claimed that Wright had threatened Dukes until he took part as well. While the alleged recantations call Dukes's credibility and testimony into question, it also undermines Wright's credibility and testimony. Dukes alleged recantation does not warrant a new trial.

Next, we consider Wright's claim that the newly discovered evidence would have "compelled" the district court to instruct the jury on accomplice testimony. Although he now raises it under the guise of newly discovered evidence, we note that Wright has already challenged the district court's refusal of his request to give the jury the accomplice instruction in reference to Perez and Dukes. In his direct appeal, our court was asked to consider if the district court erred. *Wright*, 2010 WL 200052, at *8. The court concluded that "[a]ny evidence to the effect that Perez and Dukes were accomplices was marginal at

---

[7] We acknowledge Perez's testimony that Wright and Williams were the shooters would have been called into question if there was evidence a third person, namely Dukes, was responsible for at least one of the shots. But there was no evidence that Perez shot Cooper, and Mathison's testimony supports the fact that Perez was not part of the shooting:

> Q. Who is Pelove? A. Perez.
> Q. Yes. A. He kind of backed out in doing the shooting, and Ray [Dukes] said that he was going to get his.

best" but then assumed without deciding that there was sufficient evidence to warrant giving the instruction. *Id.* at *9. The court ultimately determined that due to the volume of evidence that corroborated the testimony of Perez and Dukes, any error in failing to give the instruction did not prejudice Wright. *Id.* at *10–11. While the evidence of Dukes's recantation affects whether there was sufficient evidence to warrant giving the accomplice instruction, it does not affect whether there was sufficient corroborating testimony for the jury to rely on Perez's and Dukes's testimony in deciding Wright's guilt. *See* Iowa R. Crim. P. 2.21(3) ("A conviction cannot be had upon the testimony of accomplice or a solicited person, unless corroborated by other evidence which shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.").

As the court stated on direct appeal:

> Even if a jury concluded that both Dukes and Perez were accomplices, the record shows considerable evidence corroborating their testimony. The evidence corroborating an accomplice's testimony need not be strong, nor must it confirm every material fact testified to by the accomplice. All that is required is that the accomplice's testimony be supported in some material fact that tends to connect the defendant with the crime charged, and therefore, supports the credibility of the accomplice's testimony. We cannot see that a jury, having been instructed on this law, would have had any difficulty finding corroboration in the record.
>
> Despite Wright's denials that he even saw Cooper that evening, and his claim that he never left Sioux City, his cell phone was receiving signals at the murder scene at the time of the murder. Cooper's blood was found in the middle of the backseat of the Mercury Marquis, indicating there were four others in the vehicle, i .e., one other person besides Williams, Perez, and Dukes. Moreover, surveillance photographs taken outside the Kum & Go gas station show a fourth individual standing outside Williams's car shortly after Cooper's murder. Additionally, Myers testified that after Cooper returned from his first visit to Perez's apartment he

stated, "Everything's all right. There's only three guys there. It's just Nick Perez, Jeremy Williams, and . . . [Wright]."

There was also substantial evidence corroborating Perez's and Dukes's testimony that Wright had possession of the murder weapon. A non-accomplice witness testified that Wright attempted to sell him a .357 or .380 handgun with no clip in August or September 2007. This testimony corroborated Dukes's testimony that Wright used a handgun with no clip to murder Cooper (and Perez's testimony that the gun had to be loaded manually one bullet at a time). Also, the .380 caliber ammunition seized from Wright's apartment prior to the offense was of the same type and caliber used in the murder of Cooper.

Further corroborating evidence is found in the fact that Wright gave several false and misleading statements when interrogated by the police on January 20. During his interview, Wright claimed to have never left his home on January 15, claimed not to know who Dukes was, and claimed to have no idea where Lawton was. However, at trial, Wright contradicted each of his earlier statements. Wright admitted he was at Perez's apartment twice that evening, and on the first occasion Dukes was also present. Wright also testified that he had previously gone to Lawton on at least one occasion.[8]

Additionally, a jury could have treated Wright's far-fetched trial testimony as further evidence of his guilt. For example, to explain the apparent presence of his cell phone at the murder scene, Wright claimed he had conveniently left it behind and found it later that evening in Williams's car. To explain the testimony from Perez's mother that she saw Wright and smelled a strong odor of cleaning fluid upon returning to Perez's apartment late the evening of January 15, Wright claimed he told Perez that day to clean up his apartment "for your momma" and "spray some smell good." To explain the .380 caliber ammunition that was seized from his efficiency apartment in September 2007 and that matched the type of bullets used to kill Cooper, Wright told the jury that the ammunition actually belonged to a roommate who had been sleeping on his couch and who ran out when the police arrived to execute the search warrant. Wright offered this explanation even

---

[8] The State presented evidence that Wright was bailed out of jail in December 2007 by a friend, Christopher Graves. The State established that Graves lives on 170th Street near Lawton, just down the road from the murder scene. At trial, Wright tried to deflect this evidence by testifying that after Graves visited him, he got Williams to help give Graves a ride home, and he rode along. Wright also testified that he and Williams may have also gone out to Graves's residence for New Year's Eve. Regardless of Wright's explanation, this evidence tends to corroborate Perez's testimony that when Wright entered Williams's car on the night of the murder he told Williams, "you know where to go, just drive," implying that Wright and Williams had mutual knowledge of the eventual murder scene.

though some of the ammunition was found on Wright's dresser and there appeared to be no other occupant of the apartment.

*Wright*, 2010 WL 200052, at *10–11. We will not reconsider whether there was sufficient corroborating evidence for the jurors to rely on Perez's and Dukes's testimony, as the corroborating evidence was not affected by Duke's alleged recantation.

The district court did not err in denying Wright's application for a new trial based on newly discovered evidence.

### B. Ineffective Assistance.

Wright raises a number of complaints regarding the effectiveness of previous counsel.[9] To succeed on his claims, he must establish "(1) trial counsel failed to perform an essential duty; and (2) this omission resulted in prejudice." *State v. Graves*, 668 N.W.2d 860, 869 (Iowa 2003). When "a claimant raises multiple claims of ineffective assistance of counsel, the cumulative prejudice from those individual claims should be properly assessed under the prejudice prong of *Strickland* [*v. Washington*, 466 U.S. 668, 687 (1984)]." *State v. Clay*, 824 N.W.2d 488, 501 (Iowa 2012). In other words, if the claimant "raises one or more claims of ineffective assistance of counsel, and the court analyzes the prejudice

---

[9] We note that both Wright and his PCR counsel filed briefs on appeal. Wright and counsel raise a number of the same issues—albeit stated differently. We have combined those claims where possible.

Additionally, Wright claims "appellant counsel was ineffective for failing to raise ineffective assistance of trial counsel," without further explanation of how trial counsel was ineffective. Insofar as we understand this to be a claim regarding appellate counsel's failure to preserve claims of trial counsel's ineffectiveness for PCR, we note that appellate counsel is not required to do so. *See* Iowa Code § 814.7(1) ("The [ineffective-assistance] claim need not be raised on direct appeal from the criminal proceedings in order to preserve the claim for postconviction relief purposes."); *see also Hannan v. State*, 732 N.W.2d 45, 50 (Iowa 2007) ("Section 814.7 allows a defendant to raise ineffective-assistance-of-counsel claims for the first time in PCR proceedings.").

prong of *Strickland* without considering trial counsel's failure to perform an essential duty, the court can only dismiss the postconviction claim if the alleged errors, cumulatively, do not amount to *Strickland* prejudice." *Id.* at 502.

*1. Williams's Jacket.* Wright maintains "trial counsel was ineffective for not objecting to a review of the brown Carhart jacket that belonged to codefendant Williams and doing a more thorough review of this evidentiary matter at trial." He maintains trial counsel "failed to investigate Williams's jacket" and claims this constitutes a breach of an essential duty. It is not clear what Wright believes trial counsel should have done. We note there was evidence presented at trial that an officer seized Williams's brown jacket from his apartment because it appeared to have blood on it. The department of criminal investigations (DCI) tested the blood and confirmed it was Cooper's.

Wright has not established what more counsel should have done or how he was prejudiced by any failure to act. This claim fails.

*2. Testimony about Location.* Wright maintains trial counsel was ineffective for failing to make a hearsay objection regarding Myers' testimony that Cooper returned from Perez's apartment—after he went the first time to "see the money"—and stated only Perez, Williams, and Wright had been there.

We agree this was a hearsay statement. *See* Iowa R. Evid. 5.801(c) ("'Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). We note that trial counsel was asked at the PCR hearing if she remembered Myers's testimony and if she agreed the statement was hearsay, but she was not asked why she did not object at the time. Thus, we have no idea

whether counsel may have made a strategic decision not to object so as not to emphasize or draw attention to Myers's statement. *See State v. Wilkens*, 346 N.W.2d 16, 18 (Iowa 1984) ("When trial counsel makes a reasonable decision concerning strategy, we will not interfere simply because the chosen strategy does not achieve the desired result."); *see also Jessop v. State*, No. 01-1333, 2002 WL 31761711, at *5 (Iowa Ct. App. Dec. 11, 2002) ("We conclude defense counsel's failure to object was made pursuant to a reasonable trial strategy, not wanting to draw undue attention or emphasis to the sheriff's unresponsive, unsolicited, unexplained, and truncated answer. Whether this strategy was a good or bad, it was a tactic that is not so unreasonable that it shows ineffectiveness.").

That being said, the admission of the hearsay evidence was not prejudicial because it was merely cumulative. *See State v. Elliot*, 806 N.W.2d 660, 669 (Iowa 2011) ("One way to show the tainted evidence did not have an impact on the jury's verdict is to show the tainted evidence was merely cumulative."). A number of other witnesses testified they personally saw Wright in Perez's apartment at various times on January 15, 2008, including Matthew Dean, Teddy Case, Perez, and Dukes. This claim fails.

*3. Admission of Photographs.* Next, Wright maintains counsel was ineffective for failing to object to the admission of photographs from Kum & Go, which purportedly showed Wright with Williams, Perez, and Dukes at approximately 8:00 p.m. on January 15, 2008. Wright raised this issue with the PCR court, and the court ruled on his claim. However, on appeal, Wright has only mentioned this claim in passing; in doing so, he has failed to properly raise

the argument for review. *See* Iowa R. App. P. 6.903(2)(g)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue.").

    ***4. Jury Instructions.*** In his application for PCR, Wright complained the trial court had erred in instructing the jury that Wright had kidnapped Cooper if he removed him from one place to another without authority, and with the intent to interfere with the performance of any government function. *See* Iowa Code § 710.1(5). Additionally, he argued the court erred in failing to provide an instruction defining "theft." However, as the PCR court noted, Wright's trial counsel did not object to the amendment to the theory of kidnapping[10] and did not request a theft instruction. Thus, Wright needed to raise his claims under the framework of ineffective assistance in order for such claims to be considered. Because he had not done so, the PCR court declined to consider either claim.

    Now, on appeal from the PCR court, Wright has adjusted his arguments to claim trial counsel was ineffective. But we will not consider claims that have not been first heard and decided by the PCR court. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). These claims fail.

    ***5. Jury Instructions: Kidnapping.*** Wright maintains trial counsel was ineffective for failing to object to the jury instruction on kidnapping, which omitted the definition for "removal."

---

[10] Technically, the State moved to amend the trial information to include interference with the performance of any government function to its theory of kidnapping on June 27, 2008—about two months before trial started. Wright's counsel initially filed a resistance. However, on August 11, 2008, at a hearing for pretrial motions, Wright's attorney indicated to the court that she was no longer resisting the amendment.

The jury was instructed:

> To prove Samuel Wright guilty of kidnapping in the first degree . . . the State must prove all of the following elements.
> 1. On or about the 15th day of January, 2008, the defendant removed Zachary Cooper from [the address of Perez's apartment].
> 2. The defendant did so with the specific intent to:
> (a) inflict serious injury upon Zachary Cooper, or
> (b) interfere with the performance of any government function.
> (It is not necessary for all jurors to agree only to option (a) or (b). It is only necessary that all jurors agree to at least one of these options.)
> 3. The defendant knew he did not have the consent of Zachary Cooper to do so.
> 4. As a result of the removal, Zachary Cooper suffered a serious injury.
> If the State has proven all of the above elements, the defendant is guilty of kidnapping in the first degree. If the State has failed to prove any one of the above elements, then the defendant is not guilty of kidnapping in the first degree and you will then consider the charge of kidnapping in the second degree . . . .

While the jury was instructed that the State had the burden to establish Wright had "removed" Cooper in order to be guilty of kidnapping in the first degree, the jury was not further instructed that the removal must be "more than the confinement or removal that is an inherent incident of commission of the" underlying crime—here, robbery. *See State v. Rich*, 305 N.W.2d 739, 745 (Iowa 1981). Wright "was entitled to the submission of an instruction pointing out the removal or confinement necessary for first-degree kidnapping." *State v. Doughty*, 359 N.W.2d 439, 441 (Iowa 1984), *see Rich*, 305 N.W.2d at 744 (holding that to constitute kidnapping, the movement "(a) Must not be slight, inconsequential and merely incidental to the other crime; (b) Must not be of the kind inherent in the nature of the other crime; and (c) Must have some

significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection").

Because the instruction on kidnapping failed to include the *Rich* tripartite test, the instruction was erroneous, and trial counsel should have objected. *See Doughty*, 359 N.W.2d at 441; *see also Moss v. State*, No. 15-1624, 2016 WL 5408092, at *5 (Iowa Ct. App. Sept. 28, 2016) (finding trial counsel had breached an essential duty for failing to object to the trial court's erroneous instruction on kidnapping). We are to consider whether the cumulative effect of counsel's errors rose to the *Strickland* level of prejudice, so, we wait to consider the prejudice element until we have finished considering each of trial counsel's alleged breach in duties. *See Clay*, 824 N.W.2d at 501.

*6. Evidence of Gang Membership.* Wright maintains trial counsel breached an essential duty by failing to make a proper objection to a witness's testimony that Wright was an "inactive member" of a gang.

At trial, a defense witness, Justin Durance, was asked by the prosecutor if he had told Wright that he was an active member of some organization. Durance admitted that he had, and when asked what organization he was part of, he answered, "Bloods." The prosecutor then stated, "And the defendant told you he was also a member—" before Wright's attorney interjected with a hearsay objection. The court overruled the objection, and the prosecutor then asked, "The defendant told you he was also a member but he was inactive, right?" Durance responded, "Yes, sir."

If trial counsel had objected to the admission of prior bad acts, the State would have had the burden to articulate a valid, noncharacter theory of

admissibility. *See State v. Caples*, 857 N.W.2d 641, 646 (Iowa Ct. App. 2014) (analyzing the admissibility of gang membership under Iowa Rule of Evidence 5.404(b) prior-bad-acts framework); *see also State v. Putman*, 848 N.W.2d 1, 8–9 (2014) (clarifying the three-step analysis necessary to determine whether to admit prior-bad-acts evidence). The court would then have been required to determine whether the evidence is relevant to a legitimate, disputed factual issue and if there was clear proof the individual against whom the evidence is offered committed the bad act or crime. *See Putman*, 848 N.W.2d at 8–9. And then, if both of those requirements were satisfied, the court would "determine whether the evidence's 'probative value is substantially outweighed by the danger of unfair prejudice to the defendant.'" *Id.* (citations omitted).

We believe the court would have sustained a prior-bad-acts objection by Wright's counsel. First, it is not clear to us that Wright's possible gang membership is relevant to any "legitimate, disputed factual issue" at trial. Durance and Wright's membership in the same gang may have explained why Durance would have a motive to testify to facts that were not true, and we note the State argued to the PCR court that the testimony was offered to show Durance's bias, but we question whether the possible bias of a defense witness is a "disputed, factual issue in the case." Even if we assume the State could have met that burden, there appears to be very little probative value to the statement, and as our supreme court has recognized, the danger of unfair prejudice due to gang membership was high. *State v. Nance*, 533 N.W.2d 557, 562 (Iowa 1995) ("Like evidence of cocaine delivery and distribution, evidence of gang membership and activity is inherently prejudicial. It appeals to the jury's

instinct to punish gang members."). Trial counsel breached an essential duty in failing to raise the proper objection.

**7. *Strickland Prejudice.*** Finally, we consider the cumulative prejudice Wright suffered from trial counsel's failure to object to the kidnapping instruction that omitted the *Rich* tripartite test and to raise the proper objection to the testimony about Wright being an "inactive" member of a gang. As a plaintiff in a PCR action, Wright "must prove prejudice by a preponderance of the evidence. 'In determining whether this standard has been met, we must consider the totality of the evidence, what factual findings would have been affected by counsel's errors, and whether the effect was pervasive or isolated.'" *Clay*, 824 N.W.2d at 496.

Although the kidnapping instruction provided to the jury was in error, we do not believe Wright was prejudiced by the mistake. From the evidence presented at trial, it was clear that Cooper was robbed and injured in Perez's apartment, a number of miles from where his body was found off a gravel road. Both Perez and Dukes testified that Cooper was forced into William's car at gunpoint, where he was made to keep his head down for the approximately twenty-five minute drive, during which Williams continued to hit and threaten Cooper. The question for the jury was whether Wright took part in the actions, not whether a removal necessary for kidnapping occurred.

Additionally, Durance's one statement that Wright was an "inactive member" of a gang is not so prejudicial as to undermine our confidence in the outcome of the trial. *See id.* As noted, Durance made the one, isolated statement regarding Wright's purported membership. Durance provided no

details or context which was likely to evoke strong emotion in the jurors, and there was no suggestion that the present charges stemmed from any gang activity. *See Putman*, 848 N.W.2d at 15 ("Evidence is unfairly prejudicial if it has an undue tendency to suggest decisions on an improper basis commonly, though not necessarily, an emotional one."). Moreover, when Wright testified in his own defense, he denied having ever been a part of any gang, stating, "I have a younger brother that I wouldn't want to grow up in that life." Wright maintained Durance "got that kind of misunderstood." Based on the testimony of multiple eyewitnesses who were unrelated to the crimes in question who placed Wright in Perez's apartment throughout the day on January 15, 2008—in direct contradiction to Wright's testimony—and the cell phone evidence showing that Wright's cell phone was near the site of the murder at the time eyewitnesses stated the murder occurred, Wright cannot satisfy his burden to show that he likely would not have been convicted if the jury had not heard he was in a gang.

Wright has failed to establish that he was prejudiced by counsel's errors.

## IV. Conclusion.[11]

Because Wright cannot establish that the newly discovered evidence probably would have changed the result of his trial if it had been available, his request for a new trial was properly denied. Additionally, Wright has not established that he was prejudiced by trial counsel's errors. We affirm the PCR court's denial of Wright's application.

**AFFIRMED.**

---

[11] In his pro se briefs, Wright challenges conclusions that could be drawn from certain testimony or pieces of evidence that were admitted at trial. These are not legal arguments for our review and are not properly before us; we have not considered them.