# IN THE COURT OF APPEALS OF IOWA

No. 16-1158
Filed September 27, 2017

**JAMES RANDALL TYSON,**
    Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
    Respondent-Appellee.
_____

Appeal from the Iowa District Court for Mills County, Mark J. Eveloff (trial)

and Susan Larson Christensen (postconviction), Judges.


James Tyson appeals from the denial of his application for postconviction

relief. **REVERSED AND REMANDED.**


Patrick A. Sondag of Sondag Law Office, Council Bluffs, for appellant.

Thomas J. Miller, Attorney General, and Sheryl Soich, Assistant Attorney

General, for appellee State.


Considered by Danilson, C.J., Tabor, J., and Blane, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2017).

**DANILSON, Chief Judge.**

James Tyson appeals from the denial of his application for postconviction relief (PCR). Tyson contends he is entitled to a new trial because trial and appellate counsel rendered ineffective assistance. He asserts trial counsel was ineffective in eliciting and failing to object to improper credibility-vouching testimony by an expert witness, in failing to object to an improper supplemental jury instruction, and in failing to ensure Tyson's participation in answering jury questions. Tyson submits appellate counsel rendered ineffective assistance in failing to raise these issues on appeal and he was prejudiced by the cumulative effect of trial and appellate counsel's errors. Because we agree he was prejudiced by the cumulative effect of the alleged errors, we conclude Tyson is entitled to a new trial. We reverse the order denying Tyson's PCR application, reverse the judgment of conviction and sentence, and remand for a new trial.

**I. Background Facts & Proceedings.**

In 2010, then nine-year-old D.B. stayed at Tyson's home for a weekend with her best friend, Ashley, whose family lived with Tyson. When D.B.'s mother picked her up at the end of the weekend, D.B. reported Tyson had touched her vagina on two occasions—once in the kitchen and once in Tyson's truck. Ashley was present on both occasions. Ashley testified during the incident in the kitchen she saw Tyson put his hand down D.B.'s pants for "[f]ive seconds or so" from her position of sitting on a couch in the living room. However, Ashley stated she could not tell if it was in the front or the back of D.B.'s pants. Ashley testified she did not see Tyson inappropriately touch D.B. in the truck.

Tyson was charged with one count of second-degree sexual abuse for the kitchen incident and one count of lascivious acts with a child for the incident in Tyson's truck. Tyson's first jury trial, commencing in December 2011, resulted in a hung jury. Tyson was retried in November 2012.

At the second trial, on the State's direct examination, the forensic interviewer who conducted an interview of D.B. testified it was her job was to get "the most accurate information" possible. She testified school-age children are less likely to be susceptible to report false allegations as they're "learning about the importance of telling the truth" and it is "not very common" for children of that age to succumb to peer pressure to make false claims. The forensic interviewer also testified it is common for children to delay reporting abuse and for the details of children's accounts of events to change over time. On cross-examination, defense counsel elicited the following testimony from the forensic interviewer:

> Q. Uh-huh. So really, when you get down to it, what is your conclusion— . . . . A. My conclusion is that she was very credible. She was able to provide a statement. She was able to provide you details about what happened, not only could she make a surface level statement that something happened, she could provide information underneath it to back up what she was saying, that she was mature. I thought she was appropriate.
> Q. Well, do you remember when I took your deposition? A. Yes.
> Q. I asked you the same question? A. Yes.
> Q. Do you remember your answer? A. No.
> . . . .
> Q. Line 27 is the question.
> Q. And your answer is? A. I don't have a conclusion.
> Q. Thanks. A. Can I explain that?
> Q. Well, you've already offered all—I mean, you changed your answer, haven't you? A. Well, not really. My conclusion not— is not if I'm saying the child is telling the truth or not. My conclusion is what I thought about her. There's a difference, I guess, for me.

Q. Well, here you say you don't have a conclusion, but you volunteer that you thought she was a nice girl and that kind of thing. So I say Question, "So the best you can say is that [D.B.] disclosed a certain behavior to you that occurred allegedly with Mr. Tyson?" And your answer would have been? Do you recall it? A. Yes.

Q. What was the answer then? A. Yes.

Q. Yes. And then I asked you, "Well, the allegations that she's given are consistent for you to draw the conclusion that she was abused?" And your answer was? A. I don't remember my answer.

Q. Do you want to have you read your answer? A. Show me where that is. "I could say that her—I could say that she provided statements about being sexually abused."

Q. Right. But you didn't talk about credibility and memory and all that kind of stuff and age appropriateness in your deposition? A. I don't think I was asked about that.

Q. Well, what about interview bias? What do you do to screen for interview bias? A. I think that goes back to my training. I think I treat every interview as an interview. I mean, I get the information from the investigator, I follow the same protocol as much as I can unless circumstances say that I can't do that. And then I do my report, and that's it. I don't provide anything else beyond that. And I try to stick to the same kind of policies with all my interviews.

Q. . . . [S]o what really what you're saying—we can glean from your testimony is that [D.B.] gave statements that were in your mind consistent with sexual abuse? A. I can tell you that she provided statements and details about being sexually abused.

Q. But you can't, obviously, say that you know whether for a fact or not that she was or was not? A. That's not my job to determine that.

On re-direct, the State elicited further testimony from the forensic interviewer respecting D.B.'s credibility:

Q. You mentioned details are important. If a child was able to describe the details of what happened, what do you mean by that? A. What I mean is, you know, a child can make a statement that they were touched by somebody. But if they're able to provide the details to back it up—who, when, where, what, how, body positions, locations, when it took place. If they can back up all those things, besides just making the statement, that lends a lot more to their credibility that they were able to provide not only just the statement up here. They can go underneath that and provide all the different details that back up that particular statement.

Q. And did [D.B.] provide you details?  A. Yes.

During jury deliberations, the jury submitted two written questions.  The initial discussions about the appropriate supplemental jury instructions to provide occurred with only counsel and the presiding judge although Tyson was available to participate.  Further, although no objection was levied by defense counsel, the response to the second question described the complaining witness as "victim" and referenced the "contact" as if the issue was not disputed.

About twenty minutes after receiving the supplemental jury instructions, the jury returned a verdict of not guilty on the lascivious-acts charge but found Tyson guilty of second-degree sexual abuse.  Tyson's conviction was upheld on appeal, and his ineffective-assistance claims were preserved for PCR.  *See State v. Tyson*, No. 13-0272, 2014 WL 2346237, at *1 (Iowa Ct. App. May 29, 2014).

Tyson filed the PCR application on March 3, 2015, and filed amended applications for PCR on June 22, July 27, and December 21, 2015.  The PCR hearing was held on February 16, 2016.  The court denied the PCR application. Tyson now appeals.

**II. Standard of Review.**

Because Tyson's PCR application alleging ineffective assistance of counsel raises a constitutional claim, our review is de novo.  *Castro v. State*, 795 N.W.2d 789, 792 (Iowa 2011).

**III. Analysis.**

Tyson maintains he is entitled to a new trial due to trial and appellate counsel's ineffective assistance by opening the door to, and failing to object to,

inadmissible credibility-vouching testimony by the expert; by failing to object to the court's answer to jury question number 2 that was prejudicial to Tyson; and by failing to ensure Tyson was afforded the opportunity to meaningfully participate in responding to the jury questions. Tyson contends he was prejudiced by the cumulative effect of these errors.

To prevail on a claim of ineffective assistance, Tyson must show by a preponderance of the evidence that counsel failed to perform an essential duty and the failure resulted in prejudice. *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006). To prove counsel breached an essential duty, the defendant "must demonstrate the attorney performed below the standard of a reasonably competent attorney." *Ledezma v. State*, 626 N.W.2d 134, 142 (Iowa 2001). "[W]e measure the attorney's performance against 'prevailing professional norms.'" *Id.* (citation omitted). To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

We first address issue four—that Tyson was prejudiced by the cumulative effect of trial and appellate counsel's errors—because we believe this issue is dispositive and incorporates consideration of all the other issues. Although we find that each of Tyson's asserted errors individually may not rise to the level of prejudice warranting a new trial, we conclude the cumulative effect of the asserted errors requires a new trial.

**A. Credibility-Vouching Testimony.**

Tyson first submits trial counsel rendered ineffective assistance by eliciting and failing to object to improper credibility-vouching testimony by the forensic interviewer. It is well-established law in Iowa that "an expert witness cannot give testimony that directly or indirectly comments on the child's credibility." *State v. Dudley*, 856 N.W.2d 668, 677 (Iowa 2014). "The ultimate determination of the credibility or truthfulness of a witness is not 'a fact in issue,' but a matter to be generally determined solely by the jury." *State v. Myers*, 382 N.W.2d 91, 97 (Iowa 1986).

> Although we are committed to the liberal view on the admission of psychological evidence, we continue to hold expert testimony is not admissible merely to bolster credibility. . . . The reason for not allowing this testimony is that a witness's credibility "is not a 'fact in issue' subject to expert opinion." Such opinions not only replace the jury's function in determining credibility, but the jury can employ this type of testimony as a direct comment on defendant's guilt or innocence. Moreover, when an expert comments, directly or indirectly, on a witness's credibility, the expert is giving his or her scientific certainty stamp of approval on the testimony even though an expert cannot accurately opine when a witness is telling the truth.

*Dudley*, 856 N.W.2d at 676-77 (internal citations omitted).

Here, the forensic interviewer's testimony vouched for D.B.'s credibility, thereby improperly commenting on the defendant's guilt or innocence. *See State v. Jaquez*, 856 N.W.2d 663, 665 (Iowa 2014). The forensic interviewer not only directly stated her conclusion that D.B. is credible but gave a number of specific reasons supporting that conclusion.

The State did not initially draw such testimony from their expert. Rather, the vouching testimony was in response to trial counsel's cross-examination.

Trial counsel permitted the inadmissible evidence to be presented to the jury by asking the forensic interviewer for her conclusion in a non-leading question.

At the PCR trial, trial counsel testified that when he asked the forensic interviewer about her conclusion he expected "she would say that the testimony or—or the interview that actually w[as] given w[as] consistent with child sexual abuse." Trial counsel further explained:

> I asked her what her conclusion was. And—and whether that may have come close, she gave an answer that I didn't expect, and I could have made a motion to strike.
> Motions to strike, in my opinion, are pretty worthless. I mean, once the jury hears it, to go back and say, I move to strike that, then it just draws that [much] more attention to the sentence and the topic, and so that's why I did that.

We acknowledge trial counsel had previously taken a deposition of the expert and received a different answer from the expert. But it is not entirely uncommon for experts to change their conclusions after being deposed. After the expert's conclusory answer was admitted, defense counsel did not make any objection or motion to strike but did make efforts to draw out the prior inconsistent statement to discredit the expert.

An objection by trial counsel that the answer was not responsive to the question may have been overruled because the question was broad: "What is your conclusion?" However, the reference to the credibility of the complaining witness was clearly inadmissible evidence, and trial counsel ought to be able to rely upon the State to inform its witnesses of the boundary between admissible and inadmissible testimony. An objection and a motion to strike inadmissible testimony would have preserved error even if overruled.

The difficult question is whether trial counsel's cross-examination question and strategy to discredit the expert—rather than to object and move to strike—was simply ill-advised or constituted ineffective assistance of counsel. *See Everett v. State*, 789 N.W.2d 151, 158 (Iowa 2010) ("In determining whether an attorney failed in performance of an essential duty, we avoid second-guessing reasonable trial strategy." (citation omitted)). Tyson's trial counsel contended his trial strategy was to discredit the expert by admitting her prior inconsistent statement.

However, in his efforts to discredit the expert, trial counsel elicited more damaging evidence by allowing the expert to explain that she had not changed her mind about the child's credibility. Counsel then preceded his next question by essentially repeating the expert's testimony, "Well here you say you don't have a conclusion, but you volunteer that you thought she was a nice girl and that kind of thing."

The prejudice resulting from the admission of the vouching testimony by the State's expert witness through Tyson's trial counsel's cross-examination was then further compounded by the State's re-direct examination and closing arguments. On redirect, the State elicited from the expert that the more details the complaining witness can provide "lends more to their credibility." This testimony was then recounted by the State during closing arguments.

"Miscalculated trial strategies and mere mistakes in judgment normally do not rise to the level of ineffective assistance of counsel." *Ledezma*, 626 N.W.2d at 143. However, "there can be a point when the tactical or strategic decisions

made by counsel from a host of competing options fall outside the broad scope of a reasonably competent attorney." *Id.* Here, if trial counsel had objected and moved to strike the inadmissible vouching testimony and was successful, it seems likely the admission of other vouching testimony would have been avoided. Moreover, if an objection or motion to strike was unsuccessful, trial counsel would still have been able to attempt to discredit the expert with her prior inconsistent statement. Thus, the only fallout of being unsuccessful in attempting to object and move to strike was drawing more attention by the jury to the expert's answer, but the fallout for having *not* objected and moved to strike was to have additional and repeated statements from the expert witness that the complaining witness was credible. Although a close question, we believe counsel's failure to object or move to strike due to his concern about drawing attention to the expert's answer was an ineffective tactic.

**B. Jury Question.**

Tyson also contends trial counsel rendered ineffective assistance in failing to object to the court's supplemental jury instruction in response to jury question number 2. In question 2, the jury asked, "Does Instruction 18 [respecting lascivious acts] #1 "fondle or touch pubes" mean skin to skin contact exclusively? Or any type of genital contact? Does Instruction 19 [respecting sexual abuse] #2-4 "genitals" mean skin to skin contact?" The court provided the following supplemental jury instruction:

> Skin to skin contact is not required to establish element No. 1 in Instruction No. 18 nor is it required to establish a "sex act" as defined in Instruction No. 19. The "sex act" or other touching may occur even though the specified body parts or substitutes are

covered so long as any intervening material would not prevent the participants from perceiving that they have touched. The State must prove the contact is between the specified body parts and must be sexual in nature. In determining whether the contact is sexual in nature you may consider the circumstances surrounding the incident including but not limited to the relationship between the defendant and the victim; whether anyone else was present; the length of the contact; the purposefulness of the contact; whether there was a legitimate, nonsexual purpose for the contact; where and when the contact took place; and the conduct of the defendant and the victim before and after the contact.

Tyson asserts the supplemental jury instruction was improper because the first sentence was sufficient, but the court added additional language that "conjoined elements of sexual abuse and lascivious acts, re-defined and impermissibly expanded their reach, and conveyed to the jury how to break their impasse and what their respective verdicts should be." Tyson additionally contends the supplemental instruction told the jury he, in fact, had "contact with" D.B. and improperly referred to D.B. as the "victim."

We do not agree the supplemental instruction to jury question number 2 confounds the elements of the two crimes. The jury was seemingly following the instructions by deliberating whether the State had proved the elements of each offense in the marshalling instructions. The supplemental instruction answered the specific question asked and did not redefine the definition of a "sex act" to encompass "touching."

Yet, we do not condone the use of the supplemental jury instruction because it included the term "victim" and because the instruction implied that contact, in fact occurred, when Tyson clearly denied any such contact. The better approach would have been to refer to the child as the "complaining

witness" or "alleged victim," rather than the "victim," and to say "if you find there was contact then . . . ."

In a case involving the issue of prosecutorial misconduct, one justice noted:

> My concern arises when we turn this type of matter into a serious appellate issue. The court correctly says that context matters when it comes to use of the term "victim." But it then proceeds to blur context in its analysis. There is a difference, of course, between a court's use of the term in jury instructions and a prosecutor's use of the term in closing argument.

*State v. Plain*, 898 N.W.2d 801, 842 (Iowa 2017) (Mansfield, J., specially concurring) (citing *Talkington v. State*, 682 S.W.2d 674, 675 (Tex. App. 1984)) (reversing the case due to the use of "victim" in the jury instructions).

Here, only one instruction—one of the two supplemental instructions— used the term "victim," and the term was only used twice in the instruction. But we conclude counsel had a duty to object to any reference to the complaining witness as "victim" in the instruction. We also find it troubling that the jury had deliberated for nearly six hours, and within twenty minutes after receiving the supplemental instructions they reached a verdict. Nonetheless, we decline to find this fact as compelling as urged by Tyson because the jury also determined he was not guilty of one of the two counts. We would not, in the absence of the other errors, find the effect of this error prejudicial.

### C. Tyson's Participation in Responding to Jury Questions.

Tyson's third issue contends he was excluded and was unable to meaningfully participate in responding to the jury's questions during deliberations. The issue was not preserved for our review as no objection was

ever raised, but we address its merits because Tyson contends the failure to preserve the issue was the result of ineffective assistance of counsel.

Upon receipt of the jury's questions, the trial judge and counsel, including Tyson's counsel, met and discussed the questions, but Tyson was not present. Subsequently, the district court made a record with both counsel and Tyson present before the supplemental instructions were provided to the jury. Tyson contends during these proceedings he did not have sufficient time to review or object to the supplemental instructions. But there is no indication that he requested additional time to review the questions or proposed answers.

A defendant's right to be present for every stage of the trial, including during discussions of supplemental jury instructions, was summarized in *Everett*, 789 N.W.2d at 155-59, and we need not repeat all of the principles here. The court did state, "We have not found a case where we have expressly held counsel's failure to ensure his client's presence or obtain his waiver to participate in the response to a jury question constitutes a failure to perform an essential duty." *Everett*, 789 N.W.2d at 159. Nonetheless, under the facts of *Everett*, the court concluded, "counsel had a duty in this instance to ensure his client's statutory and constitutional rights were protected. Moreover, we find in counsel's testimony, no justification for his failure to do so in this case." *Id.*

In *Everett*, contrary to Tyson's circumstances, the defendant was not even notified of the jury question and was not present for any of the proceedings relative to the question or proposed answer. Here, we have not been provided any basis to justify Tyson's absence from the initial discussions relative to the

jury questions and proposed answers, but clearly Tyson had the opportunity to ask for additional time to review the jury questions and answers before the supplemental instructions were provided to the jury and did not. Under these facts, we are not convinced more meaningful participation alone would have changed the outcome of this case.

### D. Cumulative Effect.

Tyson asserts he was prejudiced by the cumulative effect of each of these alleged errors. "Under Iowa law, we should look to the cumulative effect of counsel's errors to determine whether the defendant satisfied the prejudice prong of the [ineffective-assistance-of-counsel] test." *State v. Clay*, 824 N.W.2d 488, 500 (Iowa 2012). "The accused is not entitled to a perfect trial, but only a fair trial." *State v. Webster*, 865 N.W. 2d 223, 233 (Iowa 2015).

We find the cumulative effect of the alleged mishaps gives cause to question the integrity of the jury's verdict. Tyson's first trial ended with a hung jury. Besides the complaining witness, the State only had one other witness— Ashley—who claimed to be an eyewitness to the alleged incident that happened in the kitchen. However, Ashley was in a separate room. Moreover, Ashley apparently did not observe the second alleged incident although seated right next to the D.B. in the pickup truck. Here, the State's case was bolstered by inadmissible vouching testimony, and one of the supplemental jury instructions was adverse to Tyson's interests. Considering the cumulative effect of counsel's errors, we conclude Tyson has satisfied the prejudice prong and is entitled to a new trial.

**IV. Conclusion.**

We find Tyson was prejudiced by the cumulative effect of the alleged errors, and we conclude Tyson is entitled to a new trial.  We reverse the PCR court's order denying Tyson's PCR application, reverse the judgment of conviction and sentence, and remand for a new trial.

**REVERSED AND REMANDED.**

Tabor, J., concurs; Blane, S.J., concurs specially.

**BLANE, Senior Judge** (concurring specially)

I write separately because, although I agree with the majority's result, I do so for different reasons. As to the defense counsel's cross-examination of the forensic interviewer, the majority finds Tyson's trial counsel was ineffective for choosing to attempt to discredit the interviewer by impeachment rather than objecting to or moving to strike the interviewer's answer vouching for the credibility of the child witness. I do not find counsel ineffective for having to make a split second "Sophie's choice" decision during trial. As Tyson's trial counsel explained, he had taken the deposition of the forensic interviewer and believed he knew what her response would be.[1] Once the interviewer stated the opinion that she found D.B. to be "credible," as trial counsel explained, he could either object and draw more attention to this statement or he could proceed to impeach with his cross-examination, using her deposition to show this was not what the interviewer had previously stated and not within her expertise. This goes to trial strategy, which we should be careful not to second-guess. *See Everett v. State*, 789 N.W.2d 151, 158 (Iowa 2010) ("In determining whether an attorney failed in performance of an essential duty, we avoid second-guessing reasonable trial strategy." (citation omitted)).

My criticism is with trial counsel's open-ended question to the interviewer, asking, "So really, when you get down to it, what is your conclusion— . . . ." This

---

[1] The majority states: "But it is not entirely uncommon for experts to change their conclusions after being deposed." I do not know the basis for such an assertion, have not seen any empirical support for it, and cannot agree with it. Although the forensic interviewer here would not be a retained expert and, thus, was not required to submit an amended expert opinion, she was certainly subject to impeachment with her deposition answer if it was different than her trial testimony, had counsel posed a question similar to that in the deposition.

question does not mirror the question in the deposition so that trial counsel could expect the same answer as in the deposition. Defense counsel had the deposition available and certainly could have thought of and formulated an appropriate question ahead of time.[2] It is also an open-ended question that does not attempt to limit or put parameters on the witness's answer during cross-examination. Tyson's counsel could not object to the question itself since he had asked it.[3] It is also questionable whether the witness's answer was objectionable, since it was responsive to such an open-ended question. See *Germinder v. Mach. Mut. Ins. Co.*, 94 N.W. 1108, 1109 (Iowa 1904). Therefore, a motion to strike the answer as non-responsive was probably not sustainable. At best, counsel would have had to object that the answer was a mixed statement of law and fact and invades the province of the jury. *See State v. Dudley*, 856 N.W.2d 668, 677 (Iowa 2014) (holding "an expert witness cannot give testimony that directly or indirectly comments on the child's credibility" because credibility of witnesses is an issue for the jury). Still, the question called for such an answer, and an objection may not have been sustained.[4] The question asked was not within the realm of competent cross-examination by criminal defense counsel and constituted ineffective assistance since it opened

---

[2] Questions posed on cross-examination may be leading for a reason—to control the witness. *See* Iowa R. Evid. 5.611(c).

[3] The majority opinion suggests that defense trial counsel "ought to be able to rely upon the State to inform its witnesses of the boundary between admissible and inadmissible testimony." Again, I cannot agree with this assertion. It would be virtually impossible for a prosecutor to anticipate and inform a witness of all areas of evidence that the witness cannot testify about. It would be more appropriate if defense counsel thought a witness may venture into an impermissible area to file a motion in limine.

[4] I do agree with the majority that a motion to strike, even if overruled, would have preserved the issue for appeal.

the door to a critical area—an expert witness vouching for the credibility of a child complaining-witness. The opened door led to additional questioning of the interviewer by both defense counsel and the prosecution in this forbidden territory, leading to a compounding of the problem.

As to the court's supplemental jury instruction in response to the jury's question number two, I agree that the use of the word "victim" has recently been commented upon by our supreme court. "There is a difference, of course, between a court's use of the term [victim] in jury instructions and a prosecutor's use of the term in closing argument." *See State v. Plain*, 898 N.W.2d 801, 842 (Iowa 2017) (Mansfield, J., concurring specially) (citing *Talkington v. State*, 682 S.W.2d 674, 675 (Tex. App. 1984), in which a Texas appellate court found the use of "victim" in the jury instructions was reversible error). It appears the trial judge fashioned the supplemental jury instruction by copying language from the prior supreme court opinion of *State v. Pearson*, 514 N.W.2d 452, 456 (Iowa 1994), where the court stated:

> Other relevant circumstances include but are not limited to the relationship between the defendant and the *victim*; whether anyone else was present; the length of the contact; the purposefulness of the contact; whether there was a legitimate, nonsexual purpose for the contact; where and when the contact took place; and the conduct of the defendant and *victim* before and after the contact.

(Emphasis added.) In *Pearson*, the supreme court used the word "victim." Although trial courts are usually safe in lifting language directly from supreme court opinions and using it as a correct statement of the law in jury instructions, I think it appropriate here to point out this example where trial judges must still analyze the words used for potential problems. Here, this could have been

avoided by substituting "alleged victim" or "complaining witness." Tyson's trial counsel was ineffective for failing to object to the word "victim" in the supplemental instruction.

The third issue addressed by the majority is whether defense counsel provided ineffective assistance by allowing discussion to take place between the court, defense counsel, and the State's attorney regarding a jury question before Tyson was present. Tyson also complained that even after he was present, he was not given adequate time to consult with counsel and to review the court's proposed supplemental instruction before it was provided to the jury. I agree with the majority that the record shows sufficient compliance with Iowa Rule of Criminal Procedure 2.27(1) that his trial counsel was not ineffective.

Finally, I do not believe we need to decide this case on cumulative error. Trial counsel failed to perform an essential duty either as to his questioning of the forensic interviewer, which injected the vouching/credibility issue into the trial, or in failing to object to the court's use of the word "victim" in the supplemental jury instruction; each breach of duty supports an ineffective-assistance-of-counsel claim. Tyson was prejudiced by each breach. Either one of these breaches of duty would support granting postconviction relief. The jury's verdict and the judgment must necessarily be reversed on either premise.