# IN THE COURT OF APPEALS OF IOWA

No. 19-1848
Filed November 30, 2020

**LAMONT MONTEE WILLIAMS,**
    Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
    Respondent-Appellee.
_____

Appeal from the Iowa District Court for Story County, Amy M. Moore, Judge.


Lamont Williams appeals the district court's denial of his application for postconviction relief. **AFFIRMED.**



Susan R. Stockdale, West Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Darrel Mullins, Assistant Attorney General, for appellee State.


Considered by Doyle, P.J., Mullins, J., and Mahan, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2020).

**MAHAN, Senior Judge.**

Lamont Williams appeals the district court's denial of his application for postconviction relief following his 2015 convictions for burglary in the second degree, assault causing bodily injury, child endangerment, and two counts of simple assault. Upon our review, we affirm the court's order denying Williams' application for postconviction relief.

**I.      *Background Facts and Proceedings***

In its opinion affirming Williams' convictions on direct appeal, this court set forth the following facts:

> Williams and the complaining witness had a two-year romantic relationship, which resulted in a child. All three resided in the complaining witness's home. However, just prior to the incident, Williams and the complaining witness broke up. Williams moved out of the home but left some of his personal effects at her home. The complaining witness eventually took Williams some of his belongings; however, several of his items remained at the home, including some legal documents, his identification, his electronic benefits transfer card, and various photos.
> Although no longer romantically involved, Williams and the complaining witness kept in communication with each other via text messages and phone calls. The complaining witness indicated she no longer wished to pursue a romantic relationship with Williams despite his repeated sexual advances. Williams contends the two continued a sexual relationship.
> Between March and April 2015, Williams and the complaining witness exchanged text messages, described as "just arguing back and forth." The arguing apparently peaked on April 13 when the complaining witness told Williams she did not want him anywhere near their child.
> That evening, the complaining witness and a friend stayed at the complaining witness's residence, where they smoked marijuana "to relax." Once the friend left, the complaining witness said she took two anti-anxiety and one antidepressant pills before going to sleep. The complaining witness testified she awakened sometime between 11:30 p.m. and 1:00 a.m. when Williams put his penis into her mouth. She further stated he proceeded to have sex with her without her consent while the child was present in the room; Williams denied the two had sex. Following this, the complaining witness testified

Williams asked her for a ride back to Ames, to which she agreed because she wanted him out of her home.

The complaining witness testified that although Williams still had personal belongings in her home, he was not welcome to enter without her permission. Williams testified he went to her home in order to retrieve his belongings. He knew the front door did not lock properly and that he could open it.

On the way to Ames with the child in the backseat of her car, the complaining witness and Williams began arguing. The complaining witness contended the argument began when Williams inquired into whether she was seeing other men and bringing them around the child, to which she admitted she was. According to her, Williams became enraged and struck her three or four times in the face with a backhanded, closed fist. She testified she then slammed on the vehicle's brakes in the middle of Highway 30. Williams testified, however, she stopped the vehicle because she dropped a marijuana cigarette when she became angry Williams was sending text messages to his new girlfriend. Thereafter, the complaining witness exited the vehicle and attempted to call 911; however, she testified Williams stopped her from doing so.

After some time, the complaining witness reentered the vehicle and resumed driving Williams to Ames. At that point, a male friend of the complaining witness called her phone, which upset Williams. Williams then hit her in the face two or three more times. Again, she tried calling 911, but Williams apparently took her phone from her. At this point, the complaining witness testified she again stopped the vehicle to attempt to call 911 for a third time. She then testified she hung up the phone because Williams told her he hid marijuana in her car. Williams denied hitting the complaining witness or stating that he hid drugs in her car but said she hung up the phone because her car smelled of marijuana.

The Iowa Department of Transportation had video from traffic cameras showing a vehicle stopped in the middle of Highway 30 at approximately 1:12 a.m. Also, Ames police did receive a "hang up" call from the complaining witness's phone at 1:25 a.m. but had no record of any other calls from the complaining witness's phone.

After dropping Williams off, the complaining witness testified she drove to Des Moines to see her friend. She later admitted to having sex with the friend.

Later on April 14, the complaining witness went to a hospital for examination. Hospital staff indicated she suffered a mild concussion and multiple bruises to her face. A sexual-assault exam was also conducted, and Williams's DNA was not found. The only DNA found was that of the friend she visited in Des Moines. A treating nurse practitioner testified the complaining witness's injuries were consistent with the account of events she gave.

*State v. Williams*, No. 15-1553, 2017 WL 108292, at *1–2 (Iowa Ct. App. Jan. 11, 2017).

The State charged Williams, and following trial, the jury found him guilty of burglary in the second degree, assault causing bodily injury, child endangerment, and two counts of simple assault. The district court credited Williams for time served on the simple assault convictions and imposed sentences on the remaining convictions to be served consecutively for a prison term not to exceed thirteen years. This court affirmed Williams' convictions on direct appeal, rejecting his challenge to the sentence imposed by the district court and preserving his claims of ineffective assistance of counsel. *Id.* at *4–5.

Williams filed an application for postconviction relief (PCR). Following trial, the court entered an order denying Williams' application. Williams appealed. Facts specific to his claims on appeal will be set forth below.

## II. Standard of Review

"Generally, an appeal from a denial of an application for postconviction relief is reviewed for correction of errors at law." *Nguyen v. State*, 878 N.W.2d 744, 750 (Iowa 2016) (citation omitted). However, "ineffective-assistance-of-counsel claims are reviewed de novo." *Id.*

## III. Ineffective Assistance of Counsel

Williams contends his trial counsel was ineffective in "fail[ing] to call witnesses" suggested by Williams and in "fail[ing] to object to prosecutorial misconduct during closing arguments." To prevail on his claims, Williams must show "(1) counsel failed to perform an essential duty; and (2) prejudice resulted." *State v. Maxwell*, 743 N.W.2d 185, 195 (Iowa 2008) (citing *Strickland v.*

*Washington*, 466 U.S. 668, 687 (1984)). An ineffective-assistance-of-counsel claim fails if either element is lacking. *See State v. Clay*, 824 N.W.2d 488, 495 (Iowa 2012).

### A. Failure to Call Witnesses

Williams contends he provided trial counsel "with the names of several witnesses who saw [the complaining witness] shortly after the alleged rape/assault and who would have testified that they did not see bruising on [her] face," and trial counsel's "choice not to utilize this evidence/testimony" constituted deficient performance by which he was prejudiced.

Two of these potential witnesses testified at the PCR trial. Amber Gross stated that she heard about the incident because she was friends with the woman Williams was dating in April 2015. Gross testified that she was walking downtown in Ames after midnight "a couple days after" the incident when she saw the complaining witness "in passing" and "her face appeared to be clear" with no signs of injuries. Gross acknowledged she was intoxicated and it was "possible" to cover bruises with makeup. Corbin McCuller testified he knew the complaining witness from Facebook, but he met her in person for the first time on the night following the incident after she called him "crying, saying she got assaulted," and picked him up. McCuller testified they had sex at her house and then they went to sleep. McCuller stated he did not notice any injuries to her face, but he admitted he "[r]eally wasn't paying attention to her." Neither Gross nor McCuller testified at Williams' criminal trial.

With regard to the decision not to call these witnesses at trial,[1] trial counsel testified:

> [W]e discussed this at length about whether we should try to argue that the bruising wasn't real.
>
> To me it made absolutely no sense to make that argument. And the main reason was because the State had an expert who was a trauma doctor in the [emergency room (ER)], I think practicing for close to 20 years in various ER situations who looked at Ms. Sheeler, saw her the night of the incident, treated her that evening and recognized bruising and swelling underneath the makeup that was already on her face.
>
> And to me it was absolutely just ludicrous to try to get a jury to believe conspiracy theory about there not being a bruise when— and that the trauma doctor of some 20 years can't recognize bruising and swelling.
>
> The reason I felt that was just so silly of an idea is because our best method of winning cases as defense attorneys is when we can take a hard fact and coopt them and make them our own and make—and make it so that our version of events is more accurate than the State's.
>
> And the problem here is that if we start asking people to disbelieve things that are easily provable, like a trauma doctor knowing what a bruise looks like, we undercut our own credibility which makes it harder to sell anything else to the jury. Tactically I wasn't going to make that argument.

---

[1] Williams also makes a reference to trial counsel's failure to cross-examine the complaining witness's mother about her statement to a police officer at the hospital that she had not noticed bruising on her daughter's face when she saw her the morning after the incident. Trial counsel testified "we didn't want to ask [the mother] about that" because they were aware "she was going to testify that [the complaining witness] did have some pretty severe bruising."

Indeed, at trial, the mother testified she took her daughter to the hospital because "they wanted to check out her head and her face and do like some x-rays and CAT scans and things like that on her face and her head because she had a large bruise and swollen spot on her face." And the State also introduced Exhibit 26, which included a text message from the mother to Williams after the incident that stated, "Stay away and stop beating her." We note, however, that trial counsel was able to elicit testimony from the mother that she "went to work" after seeing her daughter the morning after the incident and "didn't suggest that she go to the hospital" or "call the police," statements that indirectly undercut the severity of the complaining witness's injuries or appearance.

Trial counsel testified her strategy was "to take the hard facts that were available and to build a more reasonable factual scenario around those hard facts to support Mr. Williams' version of events": "The strategy was ultimately going to be since most of this was based on [the complaining witness's] assertions, that she was angry and she was making things up; and so our point was to discredit [her] as much as possible." Williams agreed this was their strategy, testifying, "My strategy was I was innocent and [trial counsel's] strategy was to prove that this is a woman scorned. That's the reason why she made up all of this."

We conclude counsel's trial strategy, tactical decisions, and accompanying investigation were reasonable under these circumstances. *See Ledezma v. State*, 626 N.W.2d 134, 143 (Iowa 2001). We further note Williams' testimony that trial counsel was "mainly focused on the big things," "[s]he wanted to remain focused on this [sexual] assault." It appears trial counsel's strategy was effective, as Williams was facing more than fifty years in prison and the jury ultimately found him guilty of lesser-included offenses than those originally charged. As trial counsel recalled, the jury's verdict "took care of the biggest issues because the sex abuse charges carry with it the longest lifetime consequences." Williams' ineffective-assistance-of-counsel claim on this basis fails.

*B.      Closing Argument*

Williams contends trial counsel was ineffective in failing to object to "three objectionable statements" made by the prosecutor during closing argument, specifically: (1) during discussion of Williams' child-endangerment charge, the statement, "by some miracle she didn't lose control," in reference to the complaining witness driving on the highway with the child in the backseat when

Williams struck her in the head; (2) during rebuttal, the statement, "The person who hasn't been truthful, I mean what you have heard, is the Defendant," in reference to defense counsel's closing argument statements that the complaining witness was untruthful; and (3) during rebuttal, the statement, "No one deserved what she went through. Doesn't matter if she made bad decisions. No one deserves to be beaten and raped. No one deserves this," in reference to the complaining witness's actions on the night of the incident, including smoking marijuana and having sex with McCuller. Williams argues he was prejudiced by trial counsel's failure to object to these "inappropriate remarks."

"In closing arguments, counsel is allowed some latitude." *State v. Thornton*, 498 N.W.2d 670, 676 (Iowa 1993). Counsel may draw conclusions and make inferences reasonably flowing from the evidence presented but may not create evidence or misstate facts. *See State v. Coleman*, 907 N.W.2d 124, 145 (Iowa 2018). When the case turns on which of two conflicting stories is true, counsel may argue that certain testimony is not believable. *State v. Graves*, 668 N.W.2d 860, 876 (Iowa 2003).

> Thus, misconduct does not reside in the fact that the prosecution attempts to tarnish defendant's credibility or boost that of the State's witnesses; such tactics are not only proper, but part of the prosecutor's duty. Instead, misconduct occurs when the prosecutor seeks this end through unnecessary and overinflammatory means that go outside the record or threaten to improperly incite the passions of the jury.

*State v. Carey*, 709 N.W.2d 547, 556 (Iowa 2006) (citation omitted). In order to establish prosecutorial misconduct, there must be (1) "proof of misconduct" and (2) "proof the misconduct resulted in prejudice to such an extent that the defendant was denied a fair trial." *Graves*, 668 N.W.2d at 869.

With regard to this issue, trial counsel testified, "I think it's fairly common for both prosecution and defense to toe up to the line of what is appropriate in a closing," and trial counsel acknowledged "there were statements in the closing [by the prosecutor] that I felt could have been objected to." But trial counsel made a conscious decision not to object, explaining:

> I could have stood up; but whenever you object, you risk the possible consequence of highlighting what the State is saying. . . . I do believe that sometimes by objecting, particularly when the State is on a role, and being sarcastic you can risk highlighting their argument too much for the jury when the jury might have been falling asleep.

When asked about the specific statements by the prosecutor, trial counsel reiterated, "It is objectionable if you want to object to it. But as far as on where the court comes down on it, I don't know there's a clear answer of where the court is going to come down on it and you risk highlighting if you object to it." Under these circumstances, and considering the wording and context of the challenged statements, we do not find that trial counsel's tactical decision not to object amounted to a breach of duty. *See State v. Ondayog*, 722 N.W.2d 778, 786 (Iowa 2006) ("[W]e do not delve into trial tactics and strategy 'when they do not clearly appear to have been misguided.' In other words, 'we will not reverse where counsel has made a reasonable decision concerning trial tactics and strategy, even if such judgments ultimately fail.'" (citations omitted)).

And even if the statements constituted prosecutorial error, we find no prejudice resulted. In the context of prosecutorial error or misconduct, to determine prejudice, we consider: "(1) the severity and pervasiveness of the misconduct; (2) the significance of the misconduct to the central issues in the case; (3) the strength of the State's evidence; (4) the use of cautionary instructions or

other curative measures; and (5) the extent to which the defense invited the misconduct." *State v. Plain*, 898 N.W.2d 801, 820 (Iowa 2017) (citation omitted). "Generally, we find prejudice where the prosecutor has demonstrated a persistent effort to present prejudicial information to the jury." *Coleman*, 907 N.W.2d at 140. Applying each factor to the challenged statements, we find no prejudice. Accordingly, trial counsel did not provide ineffective assistance in failing object. *See State v. Fountain*, 786 N.W.2d 260, 263 (Iowa 2010) ("Counsel has no duty to raise an issue that has no merit.").

We affirm the court's ruling denying Williams' application for postconviction relief.

**AFFIRMED.**